504 So.2d 675 (1987)
Hillman T. FRAZIER and Billy (Bill) F. Knox
v.
The STATE of Mississippi, By and Through Edwin Lloyd Pittman, Attorney General of the State of Mississippi and
Donald N. LOGAN, James D. Nunnally, Manuel Killebrew, Douglas L. Anderson, and Perrin H. Purvis, Individually and in Their Official Capacities as Public Officers and Public Servants
v.
The STATE of Mississippi, By and Through the MISSISSIPPI ETHICS COMMISSION, a State Agency; Walter Brown, Ben H. Stone, Mark G. Hazard, Eugene L. Fair, Nina B. Goolsby, John C. Henegan, and Elizabeth C. Powers, Individually and in Their Official Capacities as Members of the Mississippi Ethics Commission
Nos. 57359, 57642.
Supreme Court of Mississippi.
March 4, 1987.
Rehearing Denied and Opinion Modified April 15, 1987.
*677 John Grisham, Jr., Southaven, H. Scott Ross, Tubb, Stevens & Morrison, West Point, J. Reilly Morse, Bryan, Nelson, Allen, Schroeder & Cobb, Gulfport, Bob Owens, Owens & Owens, Jackson, James W. Craig, Byrd and Associates, Jackson, Azki Shah, Clarksdale, for appellant in No. 57642.
W. Wayne Drinkwater, Jackson, E. Spivey Gault, Lake, Tindall, Hunger & Thackston, Greenville, James P. Coleman, Ackerman, for appellee, in No. 57642.
Edwin Lloyd Pittman, Atty. Gen. by Stephen J. Kirchmayr, Deputy Atty. Gen., Jackson, W. David Watkins, Holmes S. Adams & James W. Young, Brunini, Grantham, Grower & Hewes, Jackson, for amicus curiae, in No. 57642.
Isaac K. Byrd, James W. Craig, Byrd & Associates, Jackson, Thomas S. Shuler, McClure & Shuler, Sardis, for appellant, in No. 57359.
Edwin Lloyd Pittman, Atty. Gen. by Pete J. Cajoleas, Asst. Atty. Gen., Jackson, for appellee, in No. 57359.
L.H. Wilson, McKinley W. Deaver, Jackson, John H. Price, Jr., Dale F. Schwindaman, Jr., Thomas Price, Alston, Jones & Davis, Jackson, W. David Watkins, Holmes Adams & James W. Young, Jr., Brunini, Grantham, Grower & Hewes, Jackson, for amicus curiae, in No. 57359.
En Banc.
*678 HAWKINS, Presiding Justice, for the court:
The State through Edwin Lloyd Pittman brought an action for declaratory judgment in the chancery court of the First Judicial District of Hinds County against Hillman T. Frazier and Bill F. Knox, alleging they were in violation of Article 4, Section 109 of the Mississippi Constitution. The final decree of that court so found, and the defendants have appealed.
The State through the Mississippi Ethics Commission brought a separate action for declaratory judgment in the same court against Donald N. Logan, James D. Nunnally, Manuel Killebrew, Douglas L. Anderson and Perrin H. Purvis, likewise alleging they were in violation of the same section of the Constitution. The final decree of that court so found, and all defendants with the exception of Purvis have appealed.
Also at issue in the chancery court was the constitutionality of certain statutes specifically authorizing the conduct in which the defendants were engaged, and the court found such statutes to be violative of the Constitution.
In addition to declaratory relief the Ethics Commission in an amended complaint sought restitution from the defendants named in its suit, for compensation received from the state in violation of Section 109. The court denied restitution. The Ethics Commission has cross-appealed from this denial.
We have consolidated these appeals, and the issues faced in each defendant's case, with the exception of Purvis, will be addressed. Mr. Purvis having refunded the State all funds with which he was charged with receiving in violation of Section 109, and having made no appeal, the decree as to him is final, and no issue as to him is before us.
On this appeal we construe Section 109 and its application to six officials serving in various public offices, together with prohibited interest contracts each was alleged to have under § 109. We likewise address the constitutionality of certain sections of Miss. Code Ann. § 25-4-101, et seq. (Chapter 469, Laws of 1983).
We further address whether the Ethics Commission had legal authority to maintain this action, and conclude it did.
For the reasons set forth below, on direct appeal we affirm the chancery court as to the defendants Frazier, Knox, Anderson and Killebrew, and affirm in part and reverse in part as to Nunnally and Logan.
We affirm on cross-appeal.

FACTS

HILLMAN T. FRAZIER
Frazier was elected to the office of State Representative, 67th District of the Mississippi Legislature most recently on November 8, 1983, for a four-year term, and formally accepted membership in that body for this term in January, 1984. On April 17, 1984, Representative Frazier voted "yea" on Senate Bill 2985, which became law on May 14, 1984, as Chapter 209, Mississippi Laws, 1984. This bill was an act making an appropriation to the Board of Trustees of State Institutions of Higher Learning for disbursement by the Board to Jackson State University and other state institutions of higher learning for the fiscal year 1985 (July 1, 1984, through June 30, 1985).
On June 19, 1985, Frazier entered into a contract of employment with Jackson State University as a Lecturer in the Department of Political Science for the June 3-July 28, 1985, period. As payment under this contract, Frazier received two checks totalling $2,484.84.
On March 19, 1985, Representative Frazier voted "yea" on Senate Bill 2997, which became law on April 19, 1985, as Chapter 149, Mississippi Laws, 1985, and which likewise was an appropriation bill to the State Institutions of Higher Learning just as Senate Bill 2985, but for the fiscal year 1986.
On September 16, 1985, Frazier entered into a contract of employment with Jackson State University in the same capacity for the September 3-December 16, 1985, period. *679 As payment under this contract, Frazier received four checks totalling $6,986.00.

BILL F. KNOX
Knox was first elected as a Supervisor, District 2 of the Board of Supervisors of Panola County in 1979, and was re-elected on November 8, 1983, for a four-term, which he began serving January 2, 1984.
On January 9, 1984, the Board of Supervisors of Panola County entered an order selecting the State Bank of Como, the Bank of Crenshaw and other Panola County banks as county depositories for the year 1984. On January 14, 1985, this Board again entered an order selecting these two banks and other Panola County banks as county depositories for the year 1985. Pursuant to these Board orders, for the period October, 1984  August, 1985, $1,095,917.57 of Panola County public funds were deposited in the State Bank of Como, and $1,516,896.62 of Panola County public funds were deposited in the Bank of Crenshaw.
Throughout 1984 Knox was president and chief executive officer of the Bank of Crenshaw, and chairman of its board of directors. On December 31, 1984, the Bank of Crenshaw was merged into the State Bank of Como, and continued to do business as the Bank of Crenshaw, a branch bank of the State of Como. Following the merger Knox remained president and chief executive officer of the Bank of Crenshaw, and was also the president, and bank security officer of the State Bank of Como, as well as a member of its board of directors. Knox was also a shareholder in the State Bank of Como, owning at least $200.00 of its capital stock. The record discloses no further information on the number of shares held by Knox, or percentage of stock ownership held by him in this bank.

DONALD N. LOGAN
Logan was principal at the Harper McGaughan Elementary School, a public school in the Long Beach Municipal Separate School District, a position he had held for a number of years, when he was elected as Alderman at Large of the city of Long Beach in a February, 1982, special election. He was re-elected in June, 1984, for a four-year term, and following his election he held both positions as school principal and alderman.
On September 7, 1982, the Board of Aldermen of Long Beach entered a resolution fixing and levying an ad valorem tax of 25.00 mills on each dollar of assessed valuation of all taxable property in the district for 1982 for operation of district schools. On September 20, 1983, this Board entered a similar resolution levying an ad valorem tax of 28.70 mills on all taxable property in the district for 1984 for this purpose. On September 12, 1985, this Board entered a similar resolution levying an ad valorem tax of 31.95 mills on all taxable property in the district for 1985 for school operating expenses.
The millage for school operating expenses mentioned above encompasses two ad valorem tax levies, a levy to support the minimum education program and a levy for the school district maintenance. The taxes collected from these levies are deposited to the credit of the school district, and from those funds Logan receives the local portion of his salary under his employment contract.
Successive annual contracts of employ between Logan and the school district were executed as follows:
May 19, 1983, with salary of $25,565 for 1983-84 school year;
May 5, 1984, with salary of $25,565 for 1984-85 school year;
June 27, 1985, with salary of $28,331 for 1985-86 school year.
As to the 1982 school tax levy, under Miss. Code Ann. §§ 37-57-3 (1972) and -57-35 (1972) (repealed 1983), upon receipt of a certified copy of the order of the board of trustees of the school district requesting the same, it was mandatory that the city board levy up to a maximum amount of 25 mills on the taxable property of the district. In addition to the statutory mandate, pursuant to a suit filed by the board of trustees of the school district against the city, the chancery court of the First Judicial *680 District of Harrison County issued a final decree permanently enjoining the mayor and board of aldermen to annually levy the statutorily mandated tax, pursuant to a request of the board of trustees by appropriate resolution or order. Long Beach Municipal Separate School District v. City of Long Beach, Cause No. 77,285 (Chancery Court, October 16, 1980). The portion of Logan's salary that came from the local tax, as opposed to state funds paid into the school district under the minimum education program, see Miss. Code Ann. §§ 37-19-37 (Supp. 1985) and -19-39 (Supp. 1985), came from these mandatory levies.
As to the 1983 school tax levy, under Miss. Code Ann. § 37-57-105 (Supp. 1985), upon receipt of a certified copy of the order of the board of trustees of the school district requesting the same, it was mandatory that the city board levy up to a maximum amount of 28 mills on the taxable property in the district, in addition to the minimum education levy under Miss. Code Ann. § 37-57-3. Under this mandate and the order of the school district, the city board levied 23.75 mills for the school district maintenance fund. Again, the portion of Logan's salary that came as a result of local taxation came from these mandatory levies paid into the district maintenance fund and minimum education fund.
As to the 1984 school tax levy, the city board and school trustees were under the same law as in 1983. Under the order from the school district, the city board levied 27.45 mills for the school district maintenance fund. Again, the portion of Logan's salary resulting from local taxation came from levies it was mandatory for the city board to make.
As to the 1985 school tax levy, under the order of the school district the city board levied 28 mills on the district's taxable property. In addition to the required 28 mills, under Miss. Code Ann. § 37-57-105 (Supp. 1985), the city board levied an additional 3.95 mills for the school district maintenance fund, which was discretionary with the city board.[1] It was from this total 31.95 mill levy and the mandatory minimum education fund levy that the portion of Logan's salary resulting from local taxation was paid under his employment contract for that year.
The record is silent as to the portion of Logan's total annual salary which came from state funds, and which portion came as a result of the local tax levies. The record contains only a factor-based salary schedule for principals adopted by the school district for the 1983-84 school year. As to that year we can only say that it appears local taxation constituted only a small portion of Logan's total salary.[2]

JAMES D. NUNNALLY
Nunnally, a resident of Tippah County, was elected to the office of State Representative, 4th District of the Mississippi Legislature in 1971, and has been re-elected each succeeding election for a four-year term. He was elected to his present term in November, 1983, and formally accepted membership in that body for this term in January, 1984. On March 28, 1984, Representative Nunnally voted "yea" on House Bill No. 1172, which became law on May 8, 1984, as Chapter 165, Mississippi Laws, 1984. This Bill was an act making an appropriation to the State Department of Education for disbursement by the Department to the South Tippah County Consolidated School District, the Benton County School District, and other public school districts *681 for support and maintenance during the fiscal year 1985 (July 1, 1984, through June 30, 1985).[3]
In 1984 Nunnally and the Benton County School District executed an employment contract whereby Nunnally was employed as a public school teacher at Ashland Middle School, at an annual salary of $15,575 for the 1984-85 school year.[4] During this time Nunnally's wife, Betty Jo Nunnally, was employed by South Tippah County Consolidated School District as a public school teacher at Pine Grove High School, at an annual salary of $15,565 for the 1984-85 school year.
On February 28, 1985, Representative Nunnally voted "yea" on House Bill No. 1172, which became law on April 5, 1985, as Chapter 95, Mississippi Laws, 1985, and which likewise was an appropriation bill to the State Department of Education just as Chapter 165, Mississippi Laws, 1984, but for the fiscal year 1986.
In addition to the appropriation bills, Representative Nunnally was a member of the Legislature when Senate Bill No. 2876 was enacted into law on March 19, 1985, as Chapter 351, Mississippi Laws, 1985. A portion of this act revised the teachers' salary schedule and increased the minimum education program allotment. See Miss. Code Ann. § 37-19-7 (Supp. 1985) (codification of teacher salary increases). While the bill passed the House of Representatives on March 17, 1985, Nunnally abstained from voting. House Journal, 1985, at p. 550-51.[5]
In 1985 Nunnally entered into a contract of employment with the Benton County School District as a public school teacher for the 1985-86 school year at a salary of $17,975. Nunnally's wife entered into a similar contract with the South Tippah County Consolidated School District for the 1985-86 school year at a salary of $17,965.
For the 1984-85 school year, the parties have stipulated that $15,325, all but $250 of Nunnally's salary, was paid from public funds appropriated by the Mississippi Legislature. As to the other employment contracts by Nunnally and his wife, the record does not disclose how much salary received by the Nunnallys was paid through the appropriation bills; however, Nunnally has stipulated that he and his wife receive "the majority" of their respective salaries from appropriated public funds.

MANUEL KILLEBREW
Killebrew was first elected as a Supervisor, District 4 of the Board of Supervisors of Quitman County on November 8, 1983, to a four-year term which he began serving January 2, 1984. At the time of his election and since he has been employed as a teacher in the Quitman County High School, a public school in the Quitman County School District.[6]
On September 21, 1984, the Board of Supervisors of Quitman County entered an order levying an ad valorem tax of 4.00 mills on each dollar of assessed valuation of all taxable property in the county for the minimum education program under Miss. Code Ann. § 37-57-1, and 16.30 mills for the school district maintenance fund.
On September 3, 1985, the Board of Supervisors entered a similar levy of 3.96 mills for the minimum education program under Miss. Code Ann. § 37-57-1, and 19.87 *682 mills for the school district maintenance fund.
As to the 1984 school tax levy, the 4.00 mill levy was mandatory under Miss. Code Ann. 37-57-1, and the 16.30 mill levy was discretionary under Miss. Code Ann. § 37-57-105 (Supp. 1985).
As to the 1985 school tax levy, the 3.96 mill levy was likewise mandatory, and the 19.87 mill levy was discretionary under Miss. Code Ann. §§ 37-57-1 (1972) and -57-105 (Supp. 1985).[7]

DOUGLAS ANDERSON
Anderson was elected to the office of State Senator, 27th District of the Mississippi Legislature most recently on November 8, 1983, for a four-year term, and formally accepted membership in that body for this term in January, 1984. On March 29, 1984, Senator Anderson voted "yea" on Senate Bill 2985, which became law on May 14, 1984, as Chapter 209, Mississippi Laws, 1984. This bill was an act making an appropriation to the Board of Trustees of State Institutions of Higher Learning for disbursement by the Board to Jackson State University and other state institutions of higher learning for the fiscal year 1985 (July 1, 1984, through June 30, 1985).[8]
In the fall school term of 1984, Anderson entered into a contract of employment with Jackson State University as an Assistant Professor of Mathematics. The record does not contain this employment contract or its relevant terms.[9]
On February 28, 1985, Senator Anderson voted "yea" on Senate Bill 2997, which became law on April 19, 1985, as Chapter 149, Mississippi Laws, 1985, and which likewise was an appropriation bill to the State Institutions of Higher Learning just as Senate Bill 2985, but for the fiscal year 1986.
In the fall term of 1985, Anderson entered into a contract of employment with Jackson State University in the same capacity as in the previous fall 1984 period.

PERRIN H. PURVIS
Purvis was elected to the office of State Senator, 6th District of the Mississippi Legislature in 1963, and has been re-elected each succeeding election for a four-year term. He was elected to his present term on November 8, 1983, and formally accepted membership in that body for this term in January, 1984. On April 18, 1984, Purvis voted "yea" on House Bill No. 1184, which became law on May 8, 1984 as Chapter 170, Mississippi Laws, 1984.[10] This Bill was an act making an appropriation to the Tombigbee River Valley Water Management District for the support and maintenance of the Water Management District for the fiscal year 1985 (July 1, 1984, to June 30, 1985). On March 20, 1985, Purvis voted "yea" on House Bill No. 1169, which became law on April 17, 1985, as Chapter 145, Mississippi Laws, 1985, and which likewise was an appropriation bill to the Tombigbee River Valley Water Management District for the fiscal year 1985-86.
Throughout 1984 and 1985 Purvis also served as president and a shareholder of P.I.A., Inc., a Mississippi corporation in the business of selling insurance.
On April 25, 1985, the Board of Directors of the Water Management District gave notice to bidders by publication that bids for insurance coverage for the District would be accepted on May 8, 1985. P.I.A., Inc., entered such a bid, which was accepted by the Water Management District, and P.I.A. began providing insurance coverage *683 for the District on May 8, 1985. As payment under this contract, P.I.A. received public funds appropriated by the Mississippi Legislature.
Subsequent to the filing of this action by the Ethics Commission, P.I.A. cancelled the insurance contract with the Water Management District and refunded its commission earned under the contract.

CONSTITUTION AND STATUTE
At issue in this case is the proper interpretation of Article 4, Section 109 of the Mississippi Constitution of 1890, and whether certain portions of Miss. Code Ann. § 25-4-105 (Supp. 1985) violate it.
Section 109 reads:
Section 109. No public officer or member of the legislature shall be interested, directly or indirectly, in any contract with the state, or any district, county, city, or town thereof, authorized by any law passed or order made by any board of which he may be or may have been a member, during the term for which he shall have been chosen, or within one year after the expiration of such term.
Miss. Code Ann. § 25-4-105 (Supp. 1985) is a part of Chapter 469, Laws of 1983, Miss. Code Ann. § 25-4-101, et seq., a comprehensive legislative enactment dealing with conflicts of interest by public officials.
The pertinent portions are as follows:
§ 25-4-101. Declaration of public policy.
The legislature declares that elective and public office and employment is a public trust and any effort to realize personal gain through official conduct, other than as provided by law, or as a natural consequence of the employment or position, is a violation of that trust. Therefore, public servants shall endeavor to pursue a course of conduct which will not raise suspicion among the public that they are likely to be engaged in acts that are in violation of this trust and which will not reflect unfavorably upon the state and local governments.
§ 25-4-103. Definitions.
The following definitions apply in this article unless the context otherwise requires:
(a) "Authority" means any component unit of a governmental entity.
* * * * * *
(h) "Government entity" means the state, a county, a municipality or any other separate political subdivision authorized by law to exercise a part of the sovereign power of the state.
* * * * * *
(j) "Material financial interest" means a personal and pecuniary interest, direct or indirect, accruing to a public servant or spouse, either individually or in combination with each other. Notwithstanding the foregoing, ownership of any interest of less than ten percent (10%) in a business or aggregate annual income of less than one thousand dollars ($1,000.00) from a business shall be deemed not be [sic] a material financial interest in such business.
* * * * * *
(p) "Relative" means the spouse, child or parent.
25-4-105. Certain actions, activities and business relationships prohibited or authorized; contracts in violation of section voidable.
* * * * * *
(2) No public servant shall:
(a) Be a contractor, subcontractor or vendor with the governmental entity of which he is a member, other than in his contract of employment, or have a material financial interest in any business which is a contractor, subcontractor or vendor with the governmental entity of which he is a member. [Emphasis added]
* * * * * *
(f) Be interested, directly or indirectly, during the term for which he shall have been chosen, or within one (1) year after the expiration of such term, in any contract with the state, or any district, county, city or town thereof, authorized by any law passed or order made by any *684 board of which he may be or may have been a member.
(3) Notwithstanding the provisions of subsection (2) of this section, a public servant or his relative:
(a) May be an officer or stockholder of banks or savings and loan associations or other such financial institutions bidding for bonds, notes or other evidences of debt or for the privilege of keeping as depositories the public funds of a governmental entity thereof or the editor or employee of any newspaper in which legal notices are required to be published in respect to the publication of said legal notices.
(b) May be a contractor or vendor with any authority of the governmental entity other than the authority of the governmental entity of which he is an officer or employee or have a material financial interest in a business which is a contractor or vendor with any authority of the governmental entity other than the authority of the governmental entity of which he is an officer or employee where such contract is let to the lowest and best bidder after competitive bidding and three (3) or more legitimate bids are received or where the goods or services involved are reasonably available from two (2) or fewer commercial sources, provided such transactions comply with the public purchases laws.
* * * * * *
(h) May be employed by or receive compensation from an authority of the governmental entity other than the authority of the governmental entity of which the public servant is an officer or employee.[11]
The Legislature submitted to the electorate of this State at the general election held on November 6, 1984, a proposal to amend Section 109 as follows:
Amend Section 109, Mississippi Constitution of 1890, to read as follows:
Section 109. No public official or public employee shall be interested in any contract with the governmental entity of which he or she is a member. The term "entity" shall mean any governmental body vested with the authority to contract.
No public official or public employee shall misuse his or her official position to obtain any pecuniary benefit for himself or herself or for any person or business with which he or she is associated.
The Legislature may further regulate conduct by public officials and public employees and may create a commission composed of members appointed by each department of government to accomplish the intent of this section.
This proposed amendment was rejected by the people.
The Legislature again submitted to the electors of this State at an election held on June 2, 1986, the following proposed amendment to Section 109:
Amend Section 109, Mississippi Constitution of 1890, to read as follows:
"Section 109. (1) No public officer, member of the Legislature or public employee shall have any interest in any contract with the governmental level of which he is a member, or within one (1) year after the expiration of his term of office or employment, if such interest would improperly influence the performance of his official duties or official actions.

(2) An improper influence would exist when a reasonably prudent public officer, member of the Legislature or public employee knows or has good reason to believe that the benefit or detriment in the subject matter in which he participates will impair his independent judgment *685 or the faithful discharge of public duties in his official capacity.
(3) An improper influence would not exist if the benefit or detriment in the subject matter which is under consideration would accrue to the public generally.

(4) No public officer, member of the Legislature or public employee shall use his official position to obtain any pecuniary benefit for himself or for any person or for any business with which he is associated, other than those benefits as may be incidental to his office or accrue to the public generally.

(5) The term "accrue to the public generally" in this section shall mean that the benefit or detriment to the public officer, member of the Legislature or public employee is affected by the subject contract, action or decision to no greater extent than any other member of the public, segment of the public, or an industry, profession or occupation.

(6) The Legislature shall provide civil or criminal penalties and other appropriate remedies for the violation of this section. The Legislature shall also provide by law for the further regulaton and definition of lawful conduct, including proper public disclosure of pecuniary interests in official matters, by public officers, members of the Legislature or public employees. The Legislature may create a commission composed of members appointed by each department of government to accomplish the intent of this section." [Emphasis added]
This proposed amendment was also rejected by the electorate.

THE ATTORNEY GENERAL'S SUIT
On November 15, 1985, the State of Mississippi, through the Attorney General Edwin Lloyd Pittman filed a complaint in the chancery court of the First Judicial District of Hinds County against Frazier and Knox seeking a declaratory judgment under Rule 57, Mississippi Rules of Civil Procedure, that both defendants were in violation of Section 109, and that Miss. Code Ann. Sections 25-4-105(3)(a) and 25-4-105(3)(h) (Supp. 1985) be declared null and void.
The Attorney General alleged that Frazier had violated § 109 by entering into an employment contract which was authorized by the appropriation bills passed by the Legislature. The State alleged Knox was in violation of § 109 as a member of the county board of supervisors which entered into a county depository contract with banks in which Knox was an officer and shareholder.
Miss. Code Ann. § 25-4-105(3)(h) is statutory authority for Frazier to be a legislator and also employed by Jackson State University. Likewise, Miss. Code Ann. § 25-4-105(3)(a) (Supp. 1985) provides statutory authority for Knox to be an officer and shareholder in the State Bank of Como while serving on the county board of supervisors, which selects the Panola County depositories. The complaint charged that these sections were at cross-purposes with and violative of Section 109.
Following a motion by the State for summary judgment, the chancery court rendered an oral opinion on March 11, 1986, followed by a written opinion on March 20, holding that to the extent these code sections provided exceptions to Section 109 they were unconstitutional and void. The court also found that Frazier held a contract with Jackson State University, a governmental entity, which was authorized by laws passed while he was in the Legislature, and therefore his contract of employment violated Section 109. As to Knox, the court found that the contracts for the banks in which he was an officer, director and shareholder were authorized by the Board of Supervisors of which he was a member, and that he was in violation of Section 109. In accordance with the written opinion of the chancellor, a declaratory final judgment in favor of the State was rendered on the same date.
Frazier and Knox have appealed.

ETHICS COMMISSION SUIT
On December 2, 1985, the Mississippi Ethics Commission (the "Commission"), as *686 a state agency, and its seven members[12] filed a complaint in the same chancery court against Logan, Nunnally, Knox, Killebrew, Anderson and Purvis seeking declaratory relief as against these defendants as sought by the Attorney General in his action against Frazier and Knox.
The complaint contained a separate count as to each defendant embracing the conduct of each, and as to Logan, Nunnally, Killebrew and Anderson, stated that insofar as Miss. Code Ann. § 24-4-105(3)(h) (Supp. 1985) purported to authorize such conduct, it violated Section 109 and was unenforceable. Therefore, each of their employment contracts was in violation of Section 109. As to Knox, essentially the same allegations was made as in the suit by the Attorney General.[13] As to Purvis, the complaint stated that insofar as Miss. Code Ann. § 25-4-105(3)(b) (Supp. 1985) purported to authorize P.I.A.'s contract with the Tombigbee River Valley Water Management District, it violated Section 109, and that the insurance contract violated Section 109.
On December 16, 1985, the plaintiffs filed an amended complaint which sought restitution from all defendants except Purvis of all funds received thereafter under their contracts, and as to Purvis that the court order restitution of all funds received then or thereafter by P.I.A., Inc.
Each of the defendants in motions to dismiss challenged the authority of the Commission to file suit. The motions alleged the Commission was a nullity under our decision in Alexander v. State, ex rel. Allain, 441 So.2d 1329 (Miss. 1983), because two members were appointed each by the Lieutenant Governor, the Speaker of the House of Representatives of the Legislature, and the Chief Justice of the Mississippi Supreme Court, that the Attorney general had not given his consent to file the suit, that the Commission had no authority to seek a declaratory judgment under Miss. Code Ann. § 25-4-19(f), that the commission had no statutory authority to bring this type of action, and that venue was improper.
In response to a motion filed by the Commission to consolidate the two actions (and later withdrawn), the Attorney General challenged the authority of the Commission to bring the suit, alleging his office had the exclusive authority to bring such a suit, and at no time had his office refused to bring any action requested by the Commission. The Attorney General finally moved the chancery court to dismiss the action of the Commission.
In an oral opinion on January 28, 1986, the chancellor announced he was overruling the motions to dismiss because of the public importance in having a judicial resolution to the questions raised in the Ethics Commission action. On February 3 the chancellor entered an order overruling the motions to dismiss. The defendants who had not already done so then filed answers.
On March 31 the plaintiffs filed a motion for summary judgment against all defendants. Various defendants filed counter-motions for summary judgment.
On April 7 the chancellor conducted a hearing on the motions for summary judgment as to all parties except Nunnally, and announced he was overruling the defendants' motions for summary judgment, and sustained plaintiffs' motion for summary judgment to the extent of granting declaratory relief. While he had previously overruled the motions to dismiss, the chancellor expressed reservations as to the validity of the Commission because of the method of appointing its Members. (Vol. III, 389)
As to restitution, the chancellor was of the view that under this Court's decision in Golden v. Thompson, 194 Miss. 241, 11 So.2d 906 (1943), the defendants would be bound to pay restitution for monies received under proscribed conditions from *687 and after the court's judgment became final.
In an amended answer filed March 13, Purvis stated a willingness to refund the entire commission P.I.A., Inc., had received under the insurance contract should the court hold there was a violation of Section 109.
The chancellor conducted a hearing as to Nunnally on June 16. On June 27 he filed his written findings of fact and conclusions of law, which we deem appropriate to set forth in some detail.
He found factually:
The action sought restitution, declaratory and injunctive relief against these defendants for conduct allegedly in violation of Section 109.
Plaintiffs were members of the Mississippi Ethics Commission, an agency of the State, and the seven members who appeared in their official positions and individually as Mississippi citizens and taxpayers.
Section 109 prohibited public officers, including legislators, from having a financial interest in any contract with the State of its political subdivisions when that contract was authorized by a law passed or order made by a public body of which the officer was a member, during or within one year after his term of office.
The Legislature in 1983 enacted the Standards of Conduct Act (the Act), Miss. Code Ann. §§ 25-4-101 to -4-117 (Supp. 1985) prohibiting certain activities through which public officials could derive pecuniary benefit by use of their official positions, defining the prohibited activities and establishing penalties for violation, Miss. Code Ann. §§ 25-4-105(2) and -4-109 (Supp. 1985). The Act also contained exceptions Miss. Code Ann. § 25-4-105(3)(a), (b), (c), (d) and (h), which had the effect of authorizing activities which would otherwise violate the Act's prohibitions. These exceptions permitted:
(a) certain public servants to contract with certain state, county or local governmental entities if such contract was let pursuant to competitive bidding or if the goods or services involved were reasonably available from less than three sources;
(b) Legislators and other public officers to be employed by or receive compensation from certain state, county or local governmental entities.
The chancellor found the statutory exceptions permitted such contracts or employment whether or not the contracts were authorized by the public body of which the officer was a member.[14]
The Commission was an agency of the State, created in 1979 by the Legislature to insure the independence, integrity and impartiality of public officials, without regard to political considerations, and to promote public confidence in governmental integrity.
The Commission was composed of eight members appointed by the Governor, Lieutenant Governor, Speaker of the House of Representatives of the Legislature and Chief Justice of the Supreme Court to four-year terms, and had been given the specific independent authority to issue advisory opinions, conduct investigations, and bring civil actions through an attorney of its choice. Miss. Code Ann. §§ 25-4-5, 25-4-17, 25-4-19(f), (g).
The Commission had determined these defendants, while falling with one or more exceptions under the Act, apparently violated Section 109. Following investigations and conferences with the Attorney General, the Commission filed this action, even though the Attorney General had filed a complaint, because of a determination by the *688 Commission that a greater variety of potential violations of Section 109 should be presented for adjudication than encompassed in the Attorney General's action.
The court then found the facts as to each of the defendants essentially as have been recited in this opinion.
His conclusions of law were:
The court had jurisdiction, and proper venue was with that court.
The Commission had authority to bring the action, under Miss.Code ann. § 11-45-11 (1972), and our holding in Grenada Municipal Separate School District v. Jesco, Inc., 449 So.2d 226 (Miss. 1984), and that it was unnecessary for the court to decide whether the commissioners in their individual capacities had standing to file the suit. The chancellor further found, however, that the commissioners had authority to bring the action as individuals, citing several authorities from this Court. (Vol. III, 455)
That while this was a type of case normally maintained by the Attorney General, and while the Attorney General had the right to direct the flow of litigation, his office could not frustrate lawful legislative purpose or block a lawful state agency from performing the lawful duties it was created to perform, and that this suit was properly before the court.
That the Commission officials' action in bringing suit against the defendants was valid, regardless of the constitutionality of their appointment (Vol. III, 457) citing decisions of this Court. While the defendants argued the Commission was unconstitutionally composed under Alexander v. State, by and through Allain, supra, the defendants did not contend the establishment of the Commission itself was beyond the power of the Legislature, or that the powers conferred upon the Commission should be removed by virtue of the source of their appointment. Therefore the Commission was a properly created and functioning state agency. The court remained concerned whether the members of the Commission could be appointed by other branches of government, but in deciding the narrow legal issue of whether the Commission officials' action was valid in bringing suit, longstanding principles of law prohibited the defendants from collaterally attacking the Commission's members.
The defendants were public officers, and in determining whether a violation of Section 109 had occurred, good faith and honest motives were not relevant, again citing decisions of this Court. (Vol. III, 458)
Regarding the conduct of the defendants, the chancellor made the following findings:

Logan. Citing Cassibry v. State, 404 So.2d 1360, 1367 (Miss. 1981), Logan's salary was a teacher was paid by ad valorem taxes levied as a result of orders entered by the city board, and therefore his contract was authorized by the city board of which he was a member. This was in violation of Section 109.

Nunnally. The appropriation bill enacted while Nunnally was in the Legislature authorized his and his wife's contracts of employment as school teachers. These constituted conflicts of interest in violation of Section 109 and of Miss. Code Ann. § 25-4-105(2) (Supp. 1985).

Anderson. As with Nunnally, the appropriation bill enacted while Anderson was in the Legislature authorized his contract of employment with Jackson State University, and violated Section 109.

Purvis. The appropriations to the Tombigbee River Valley Water Management District authorized the contract of insurance with P.I.A., Inc., and the District. As president and shareholder in P.I.A., this violated Section 109.

Killebrew. As with Logan, Killebrew's salary as a teacher in Quitman County was paid by ad valorem taxes levied as a result of orders entered by the Board of Supervisors of which he was a member, and his employment contract *689 was likewise authorized by the board of which he was a member. This was in violation of Section 109.
To the extent the provisions of Miss. Code Ann. § 25-4-105(3) undertook to provide exceptions to Section 109 for these defendants, it was unconstitutional and void.
The court granted the following in regard to remedies:
Restitution as prayed for by the plaintiffs was denied, under Golden v. Thompson, supra.

A declaratory judgment would be entered holding that each defendant was in violation of Section 109, and to the extent that Miss. Code Ann. § 25-4-105(3)(a), (b) and (h) attempted to provide exceptions for public officers and members of the Legislature, these statutes were unconstitutional and void.
The court declined to enjoin the defendants from divesting themselves of any contractual interest, or resigning from public office, because the choice would obviously have to be made when the judgment became final.
A final judgment in accordance with this opinion was entered on July 22, 1986.
Purvis has perfected no appeal.
The remaining defendants have appealed. The Commission has cross-appealed the denial of restitution.

LAW

LEGALITY OF ETHICS COMMISSION SUIT
Only the appellant Anderson has assigned as error on appeal the refusal of the chancellor to dismiss the Ethics Commission suit. The Attorney General with leave of this Court has filed an amicus curiae brief challenging the authority of the Commission to bring its action. We address this serious question at the outset, and a brief factual recitation (omitted above) is in order.
The Ethics Commission became concerned with the statutory exceptions contained in Chapter 469, Laws 1983 (The Standards of Conduct Act) to Section 109, and had received requests for advisory opinions from public officials.
This concern evolved into a decision by the Commission at its May 10, 1985, meeting to institute a suit against public officers at state, county and municipal levels of government. A subcommittee of the Commission met with the Attorney General and members of his staff a few days later. On June 7, 1985, the Commission identified seven possible defendants, and submitted their names to the Attorney General.
Thereafter a difference arose between the Commission and the Attorney General's office as to who should be sued. We credit both sides of this matter with absolute integrity and good faith, and the difference between their views and understanding is not necessary to our resolution of this matter. It is only necessary to note that on November 15, 1985, the Attorney General filed his action, and the Commission, concluding that the Attorney General would not file suit against the other defendants until the first suit was decided, resolved on December 2, 1985, to commence this action.
While it is quite true that the Attorney General partially complied with the request of the Commission and did indeed file a suit, it is just as obvious that he chose not to sue other defendants, which thereby would have precluded the judicial resolution of all questions which the Commission had determined needed to be settled. It is also true that the Commission was well within its statutory framework of powers and duties in seeking judicial resolution of all questions. See Miss. Code Ann. § 25-4-19 (Supp. 1985). The Commissioners had a right to ask a court of this State to settle the issues, to call upon the Attorney General for assistance, and to file the appropriate action.
The Commissioners determined the suit the Attorney General filed did not cover the needed territory. Having made this determination, and concluding that the Attorney General would not assist them until the suit he filed was terminated, they employed counsel and filed suit themselves.
*690 Having done so, through their counsel on January 6, 1986, they asked the Attorney General to commence and prosecute this action.
The Attorney General responded by letter of January 6, 1986:
However, to correctly state the position of this office, I will reiterate that if the lawsuit as filed (the Attorney General's suit) does not accomplish the desired results and it becomes necessary to sue other individuals, such suit will be expeditiously filed and judicially prosecuted.
This Court, sitting in review of the facts after development in protracted trial court proceedings, observes that while the Attorney General's suit covers a large portion of these troubling issues, it does not cover them all. Moreover, neither the Commission nor the chancellor when he overruled the Attorney General's motion to dismiss had the benefit of hindsight.[15] We have no difficulty in concluding that both the Commission and the chancellor had every reason to feel the impelling need for this State and our citizens to have the questions raised by the Ethics Commission suit, in addition to the Attorney General's suit, judicially resolved with reasonable judicial dispatch, and not, as the chancellor noted, "piecemeal."
Under our appellate procedure of pronouncing principles of law no further than necessary to settle the facts of a particular case, we must also conclude, as did the chancellor, that it would be a serious blow to our State if we did not resolve the issues raised by the Ethics Commission suit as well as the Attorney General's suit now.
Unquestionably, the Attorney General was the proper party to institute and manage this suit, as he is by common law, statute, and our Constitution the chief legal officer for this State. Mississippi Constitution of 1890, Article 6, Section 173; Miss. Code Ann. § 7-5-1; Kennington-Saenger Theaters, Inc. v. State, 196 Miss. 841, 18 So.2d 483 (1944); Capitol Stages, Inc. v. State, 157 Miss. 576, 128 So. 759 (1930). These cases provide that the Attorney General has the power to bring, control and manage the litigation on behalf of the State when the subject matter is determined to be of statewide interest.
However, all public officers, including the Attorney General, are subordinate to the laws of this State. See State v. Warren, 254 Miss. 293, 308-309, 180 So.2d 293, 300 (1965) (Attorney General clothed with all common law powers "except insofar as they have been expressly restricted or modified by statute or the State constitution.")
Thus the question in this case may be stated as follows: When a state agency attempts in a lawful manner to fulfill certain duties and responsibilities charged by statute and calls upon the State's chief legal officer for representation, is the Attorney General obligated to either (1) represent the agency with the same fidelity any client is entitled to be represented, or (2) permit the state agency to secure counsel of its choice?
The Attorney General contends that since his authority to bring, manage and control litigation of statewide interests is exclusive, no such authority exists in a state agency. The Attorney General also asserts that whether or not the subject matter is of statewide interest lies within the Attorney General's discretion.
The cases cited by the Attorney General are distinguishable from this case. Capitol Stages, Inc. v. State, supra, was a case where a district attorney sought to prevent by injunction a bus line from using the highways of this State. Kennington-Saenger Theaters, Inc. v. State, supra, was a quo warranto suit by a district attorney to oust a theater chain from doing business in this State. These cases *691 presented questions as to whether the district attorney on his own initiative had authority to bring the suit. We held that suits of this nature were not within the framework of laws the district attorney is called upon to enforce, and that the trial court should have dismissed them. There was no state agency involved in either case calling upon a state's attorney to file suit.
White v. Lowry, 162 Miss. 751, 139 So. 874 (1932), was a case where the state auditor filed a suit without referring the matter to the Attorney General's office at all. We held no suit should have been filed without first referring the matter to the Attorney General for appropriate action.
Dunn Construction Co. v. Craig, 191 Miss. 682, 2 So.2d 166 (1941), was a case where the state tax collector filed suit to collect gross income tax, and in that case the Attorney General had indeed refused to file the suit. In that case, however, we held that where there was a statute giving exclusive jurisdiction of collection of the tax to the State Tax Commission, it was not a matter of the official concern of the state tax collector. Dunn would be more apposite to this case had it been the state tax commission rather than the state tax collector which had requested the Attorney General to file suit.
As the Attorney General argues, this Court has in the strongest possible terms unequivocally held that it his official prerogative to institute suits on behalf of the State, vouchsafed by our Constitution, our statutory law, and the history of common law. However, while this fundamental precept is indeed entitled to profound respect and deference, none of the decisions cited really cover the precise issue in this case. What we hold today is no departure from those decisions.
If this suit was necessary in order for the members of the Commission to properly fulfill the functions and responsibilities with which they were charged, then they were manifestly entitled to have some attorney represent the Commission in pursuing the matter in court. It is just as obvious that they were entitled to an attorney who had no conflict with the lawful purposes they were charged with carrying out, one who could serve such purposes with complete loyalty.
The Attorney General is indeed the attorney for the State to represent the people's interest. In representing the people it is his solemn lawful, professional and ethical responsibility to see that a state agency attempting to fulfill a lawful purpose is represented by his office with complete and unswerving fidelity. For in carrying out such lawful responsibilities, the state agency is for all intents and purposes the State of Mississippi and its people. The Attorney General is first and foremost a lawyer, generally among the state's most able, and he, like all lawyers, has an ethical duty to see that his loyalty is never diluted.
It therefore follows that while the Attorney General's office in advising state agencies as to the law and whether or not a suit should be filed will almost invariably be persuasive, his advice is not necessarily conclusive.
If an Attorney General declines to file a suit referred to him by a state agency, where the matter is of serious concern to state government, then that agency, if it determines its duties and responsibilities so require, is at least entitled to have some court pass upon whether it should have its full day in court. If the court determines that the subject matter of the litigation is one with which the agency is called upon to protect and enforce, then the agency should have its full day in court, which necessarily carries with it the right to have a lawyer represent it. The Attorney General's refusal to represent the agency does not deprive the court of the authority to keep jurisdiction and entertain the suit.
On the other hand, if the court determines the suit is outside of the official concern of the state agency, it should dismiss the case.
But in event of disagreement, it should be the court, not the Attorney General, which makes the final determination whether or not the agency is representing *692 the people by carrying out lawful functions for which it was created.[16]
This suit concerned conduct the Commission was required to supervise, investigate and regulate, and was clearly within the framework of duties the Commission was called upon to carry out. A reading of the Ethics in Government Act makes this plain. Miss. Code Ann. §§ 25-4-1,  31 (Laws of 1979, Ch. 508; Laws 1982, Ch. 448). We specially note Miss. Code Ann. §§ 25-4-1; 25-4-17(h), (i), (j); 25-4-19(b), (g)(i)(ii); 25-4-21.
Indeed, it is clear that it was the investigation by the Commission which developed the factual background upon which the Attorney General ultimately based his suit.
Miss. Code Ann. § 25-4-19(f) and (g) authorize the Commission to employ counsel without reference to the Attorney General in order to file an action to seek restitution. The Commission argues this as one of the reasons it was authorized to institute suit, since restitution was sought in the amended complaint. The Attorney General argues otherwise. While we are inclined to agree with the Commission, we do not base our decision on a technical construction of this section. Rather, we note Miss. Code Ann. § 25-4-19(b) and Miss. Code Ann. § 25-4-21(e)(iii) specifically authorize the Commission to call upon the Attorney General for assistance in investigation of a public officer's conduct and recovery of civil remedies.
It would be meaningless for the statute to provide that the Attorney General could be called upon for assistance, then give him the sole and absolute prerogative whether or not to assist the Commission. The statutory right of a state agency to call upon the chief legal office of this State for assistance carries with it the word "meaningful."[17]
We believe this decision is in accord with sister states which have been faced with similar questions. In Romulus City Treas. v. Wayne City Drain Comm'r., 413 Mich. 728, 322 N.W.2d 152, 157 (1982), the Michigan Supreme Court "also recognized the capacity of public officials to sue commensurate with their public trusts and duties." In State ex rel. Howard v. Oklahoma Corp. Comm'n. 614 P.2d 45 (Okla. 1980), a state commission being sued requested its own counsel since the Attorney General in that state had a conflicting position. The Oklahoma Supreme Court stated:
If, then, the Commission may be brought into court by relators ... under any concept of affording it any semblance of even-handed justice, [the law] must require that it be represented if it so desires, by counsel who can and will ably and conscientiously express its views to the tribunal.
Id. at 50.
The Howard court also stated that if the object of the suit is to vindicate a public right, and the Attorney General refused to act, an action may be brought in the name of the state by a private citizen in order to protect the interest of the state. See also League of Women Voters v. Board of Comm'rs., 451 Pa. 26, 301 A.2d 797 (1973).
We held in Grenada Municipal Separate School District v. Jesco, 449 So.2d 226 *693 (Miss. 1984), that a school district authorized to enter into a contract had the authority to sue for its breach, and there was no necessity that suit be brought by the Attorney General (who had declined to file the action).[18] In State v. Wheatly, 113 Miss. 555, 589, 74 So. 427, 429 (1917), this Court held that a board of supervisors had authority to contest the legality of laws which might cause them to violate their oaths.
In the case before us, the Attorney General did have the authority to file and prosecute this suit, but his failure to do so did not deprive the Commission of doing so.
As to the contention of Anderson that the membership of the Commission was illegally and unconstitutionally appointed, this constitutes a collateral attack upon the membership, which Anderson cannot do in this proceeding. Miss. Code Ann. § 25-1-37; Trahan v. State Highway Commission, 169 Miss. 732, 151 So. 178 (1933); Cooper v. Moore, 44 Miss. 386 (1870); Upchurch v. City of Oxford, 196 Miss. 339, 17 So.2d 204 (1944).

SECTION 109
Miss. Const. Art. IV, § 109, reads:
No public officer or member of the legislature shall be interested, directly or indirectly, in any contract with the state, or any district, county, city or town thereof, authorized by any law passed or order made by any board of of which he may be or may have been a member, during the term for which he shall have been chosen, or within one year after the expiration of such term.
This section prohibits any public officer or member of the legislature from:
(a) having any direct or indirect interest in any contract
(b) with the state or any political subdivision
(c) executed during his term of office or one year thereafter, and
(d) authorized by any law, or order of any board of which he was a member.
At the outset we note there is no difficulty in ascertaining (b) and (c), whether the contract was with some governmental entity and the time of its execution. We observe further that while (a) and (d) of the above factors are not always so clear-cut, the answer has usually been simple. See: Golding v. Salter, 234 Miss. 567, 107 So.2d 348 (1958) (county-owned hospital trustees were public officers and hospital purchasing eggs and beef from trustees violated 109); State ex rel Sterling v. Board of Levee Comm'rs, 96 Miss. 677, 51 So. 211 (1910) (president of levee board of commissioners was public officer and in violation of 109 when employed by levee board as special attorney); Noxubee County Hardware Co. v. City of Macon, 90 Miss. 636, 43 So. 304 (1907) (city alderman in violation of 109 when his retail business sold hardware supplies to city-owned electric utility).
Yet it is (a) and (d) where the gray areas are encountered. What is meant by "direct or indirect interest"? When is a contract "authorized by law, or an order of a board of which the public officer is a member"? In Cassibry v. State, 404 So.2d 1360 (Miss. 1981), we found no difficulty in determining that Cassibry had been interested in a contract with the State, even though the contract was not with him individually, because the contract enabled his client to employ him virtually full time as an attorney for two years. We were also confronted with the question of whether the appropriation bill to the State Department of Public Welfare, which funded programs such as the one paid under the contract in which Cassibry was interested, was a "law authorizing the contract." We found it did, because without the appropriation, no such contract would have been legally binding upon the State. Cassibry v. State, 404 So.2d 1360, 1366-1367 (Miss. 1981); citing *694 Colbert v. State, 86 Miss. 769, 39 So. 65 (1905); Constitution Article 4, §§ 63, 64, 68, 69, 113, 115; State v. Cole, 81 Miss. 174, 32 So. 314 (1902). See also Dickinson v. Edmondson, 120 Ark. 80, 178 S.W. 930, 931 (1915); Leddy v. Cornell, 52 Colo. 189, 120 P. 153, 154 (1912); State v. Carter, 167 Okl. 32, 27 P.2d 617, 620 (1933); Palmer v. State, 11 S.D. 78, 75 N.W. 818 (1898).
Further observations about 109:
First, it is clear this section is to protect the government. It is not a provision to protect individual rights. It is not concerned with whether some individual or class of individuals may suffer from its enforcement. As noted in Noxubee County Hardware Co., supra, the transgression test is intended to be mechanistic and objective, and motives and intentions of persons who violate it are immaterial. Its purpose is to remove any temptation to invade its proscription.
It is also a self-executing section, and more specific than many, perhaps most, constitutional provisions. See, e.g., Bucklew v. State, 192 So.2d 275 (Miss. 1966) (§ 175 held self-executing); In re Initiative Petition No. 281 v. Rogers, 434 P.2d 941 (Okla. 1967). It prohibits an individual having an interest in a contract when he as a public officer served on the official body which enabled the contract to come into being. It is that simple. Being self-executing, its provisions cannot be modified or encroached upon by the Legislature. Opinion of the Justices, 287 Ala. 337, 251 So.2d 755, 759 (1971); Frost v. Johnston, 262 Ky. 592, 90 S.W.2d 1045, 1048 (1936); State v. Smith, 355 Mo. 27, 194 S.W.2d 302, 305 (1946).

INTERPRETATION GUIDELINES
It is the prerogative and responsibility of this Court to make the final interpretation of our State's Constitution. Alexander v. State, by and through Allain, 441 So.2d 1329, 1333 (Miss. 1983), and this document is presumed capable of ordering human affairs decades beyond the time of ratification, under circumstances beyond the prescience of the draftsmen. Id. at 1334.
Our purpose in construing Section 109 is to "ascertain and give effect to the intent of those who adopted it," Moore v. General Motors Acceptance Corp., 155 Miss. 818, 822, 125 So. 411, 412 (1930); and while "its words must be the sole boundary [of its meaning]," State v. Henry, 87 Miss. 125, 144, 40 So. 153, 154 (1906), "ascertained from the plain meaning of the words and terms used within it," Ex parte Dennis, 334 So.2d 369, 373 (Miss. 1976), we should likewise "look to the circumstances under which the provision was ordained, the objects ..., the evils to be avoided or cured, and thereby arrive at the reasonable meaning..., keeping in mind [it was] intended to stand ... for a long, long time." Trahan v. State Highway Comm'n., 169 Miss. 732, 749, 151 So. 178, 182 (1933). It is not the function of judges to dwarf the grandeur of a Constitution by decisions which stifle any of its promises.
Our interpretation should not be "too literal," Dunn v. Love, 172 Miss. 342, 355, 155 So. 331, 333 (1934); City of Jackson v. Deposit Guaranty Bank & Trust Co., 160 Miss. 752, 133 So. 195 (1931); and we have recognized that no constitutional prevision requires to be done that which is "thoroughly impracticable." Gulf Refining Co. v. Stone, 197 Miss. 713, 741, 21 So.2d 19, 21 (1945). We have likewise stated that our Constitution should be interpreted:
... In the light of developments which have appeared at the time of interpretation, and may therefore include things and conditions which not only did not exist but were not contemplated when it was drafted, so long as the new developments are in their nature within the scope of the purposes and powers for the furtherance of which the constitution was established.
Stepp v. State, 202 Miss. 725, 729, 32 So.2d 447, 447, suggestion of error overruled, 202 Miss. 725, 33 So.2d 307 (1947).
Our task, then is to carefully examine the words of § 109, the circumstances attending its adoption, and the evils it sought to avoid, thereby ascertaining the intent of its authors in light of the times in which we presently live. While it is unnecessary that *695 we attribute to them supernatural ability, we must recognize that the body adopting our Constitution was composed of practical men of sound judgment, endowed with an abundance of common sense. The evils they envisioned in adopting this action were not imaginary in 1890, and they have not vanished in the ensuing years. The problems they addressed no doubt then, and most certainly now, can occur in a wide variety of factual settings.
Returning to our observation that § 109 is to protect our state government, we must interpret this section in accordance with the plain meaning of its words so long as it bears some rational relationship to this purpose. Yet no meaning, however abstractly valid, should be carried into practical effect if doing so would cause grave risks to be imposed on the sound government of the people of this State. Such an interpretation would insult the common sense of our predecessors when they adopted § 109.
Finally, in our interpretation we must take into account the rejection by the people in 1984, and again in 1986 of proposed amendments to § 109. Article 3, Sections 5 and 6 of our Constitution leave no doubt that "all political power is vested in, and derived from, the people," and the people have the "sole and exclusive right to ... alter ... their constitution."

THE DEFENDANTS
In Cassibry, 404 So.2d 1360, 1368, we stated there was no need to define the edge of a target when the defendant had scored a bull's-eye. Necessarily implied in that statement is the fact that the target does have an edge.
Most of these cases do indeed approach the edge of the target. Do they hit the target at all? Do they indeed come within the prohibition of § 109? We state at the outset that in all proceedings there is no suggestion but that all the defendants have served honorably in their official positions.

ANDERSON, FRAZIER AND NUNNALLY
These defendants all serve in the Legislature. We have answered Anderson's claim that the Ethics Commission did not have authority to litigate.
Anderson has only one other assignment of error, which is also argued by Frazier and by Nunnally, that the appropriation bills did not "authorize" their contracts. In addition to what we stated in Cassibry and above in this opinion in answer to this contention, it would denigrate the awesome importance, meaning and purpose of appropriation laws in the Legislature to accept the interpretation urged by the defendants. In the absence of some grave emergency, no state official, however supreme, has the power to obligate this state to pay one dollar without there having been an appropriation therefor.[19]See, e.g., Dickinson v. Edmondson, 120 Ark. 80, 178 S.W. 930, *696 931 (1915); Burr v. City of San Francisco, 186 Cal. 508, 199 P. 1034, 1036 (1921); McDougall v. Board of Comm'rs, 49 P.2d 663, 666 (Wyo. 1935).
The governmental bodies contracting with these defendants could not have made payment under the contracts without these appropriations. These appropriation bills were laws. Cassibry, 404 So.2d 1360, 1366 (Miss. 1981). They were laws passed while these gentlemen served in the Legislature. Their contracts were made while they were in the Legislature. Thus, they squarely fit the prohibition of § 109.
Frazier makes two other assignments of error. He asserts the suit against him was moot, which we find without merit. Frazier has taught part-time at Jackson State University since 1976. See: Strong v. Bostick, 420 So.2d 1356 (Miss. 1982); United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303, 1309 (1953); County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642, 649 (1979). Also, there is a public interest exception in this case. See Sartin v. Barlow, 196 Miss. 159, 16 So.2d 372 (1944); M.T. Reed Construction Co. v. Jackson Municipal Airport Authority, 227 So.2d 466, 468 (Miss. 1969); Fordice v. Warren County Board of Education, 245 So.2d 201, 203 (Miss. 1971).
We likewise find no substance to Frazier's contention there was a factual issue as to whether his salary came from the state appropriations.[20]
Nunnally argues in addition that the appropriation bills authorizing his contract were "general" appropriation bills and not "specific" like the appropriation in Cassibry. While it is correct that in Cassibry we did not address whether a general appropriation bill should be treated differently from other appropriation bills of the Legislature, and there is some support for Nunnally's contention in State, ex. rel. Baca v. Otero, 33 N.M. 310, 267 P. 68 (1928), we cannot see such a distinction between House Bill No. 1172 (Chapter 165, Mississippi Laws 1984), which appropriated the funds necessary for a major portion of Nunnally's salary, and Senate Bill No. 2985 (Chapter 209, Mississippi Laws 1984), which appropriated the funds necessary for Anderson's and Frazier's salaries, as to require a different holding under § 109 in his case. Frazier and Anderson make no claim that their appropriation was general, as indeed it was not.
The Supreme Court of Oklahoma faced a virtually identical case as here in State v. Board of Education of Dependent School District No. D-38, 389 P.2d 356 (Okla. 1964). Article 5, Section 23 of the Oklahoma Constitution stated in pertinent part:
... nor shall any member, during the term for which he shall have been elected, or within two years thereafter, be interested, directly or indirectly, in any contract with the State, or any county or other subdivision thereof, authorized by law passed during the term for which he shall have been elected.
During State Representative Settles' term, the state legislature appropriated $52,500,000 for the support and maintenance of the public schools of Oklahoma. The local school district received approximately 85% of its funds from the state, and about 93% *697 of the district's expenditures were for salaries of school teachers.
The Oklahoma Supreme Court noted that the above-quoted clause of its constitution had never been directly construed by that court, "if indeed construction is necessary." 389 P.2d at 359. That court held Settles was in violation of its state's constitution.
The Oklahoma Supreme Court held, as we have held, that the appropriation bill was necessary to make Settles' school contract legal and binding, and therefore his school contract violated the state constitution. See generally Norbeck & Nicholson Co. v. State, 32 S.D. 189, 142 N.W. 847 (1913); Lillard v. Freestone County, 23 Tex.Civ.App. 363, 57 S.W. 338 (1900).
Also, as we have noted above, Nunnally was a member of the Legislative session setting teachers' minimum salaries statewide, and a major portion of his compensation is paid by the state rather than the local school district.
Nunnally makes the additional argument that his interest, being one of a class, is de minimis. This is a troublesome question, not however because his interest is de minimis. The term de minimis non curat lex means the law cares not for small things. If only a small portion of Nunnally's salary, as opposed to virtually all, came from the appropriation bill, he might have an argument. For here again, it would insult the common sense of the 1890 Constitutional Convention that they intended any interpretation of § 109 to trickle down to triviality.
Yet, what about Nunnally's being but one of a large class of individuals who will benefit from this appropriation?
Unfortunately for Nunnally, § 109 makes no exception for members of a large class. We must give weight to the words of § 109, and this is precisely how the Oklahoma Supreme Court interpreted that state's virtually identical constitutional provision involving a general appropriation bill.
We must agree that it is relentlessly severe to conclude § 109 means no employed public school teacher can serve in the Legislature. Yet § 109 is just as plain in its restriction as the Oklahoma constitution. We cannot hold that applying § 109 to employed public school teachers goes beyond any rational purpose or intent of its authors.
Even if we were inclined to view § 109 as Nunnally argues, this court cannot overlook the vote of the people of this State in 1984 and 1986 when amendments to § 109 which would clearly have authorized these defendants' conduct were soundly rejected by the people. Can we give an interpretation to § 109 which, when presented to the people for their approval, was soundly rejected? To do so would be an affront to Article 3, Sections 5 and 6 which declare all governmental power is vested in and derived from the people.
The people were not asked to repeal § 109, but were asked to amend it so that it would read a certain way. They rejected that "certain way." We cannot hold their rejection meaningless to any interpretation of § 109.

MRS. NUNNALLY
As to a legislator's wife being affected by this appropriation bill, however, we must reach some balance. There must be a point at which any prohibition which might be gleaned or strained from § 109 must be balanced against the potential harm to the state by its enforcement. Mrs. Nunnally is one of several thousand people affected by this appropriation bill and the law setting teachers' salaries. It is common knowledge that in the majority of households in this state, both spouses are employed outside the home.[21] It has become a necessary part of our economic life.
*698 To inform the people of this state that they could not elect an individual to the legislature whose spouse is employed by the state as a member of a large class would be an unchannelled proscription that would strike out at public officials at random and risk depriving our people of the choice of selecting what may well be among our most able and deserving public servants. It is also a matter of common knowledge that it is not easy to get qualified citizens to offer their talents for public office. It is vital to democratic government that membership in the Legislative body be composed of members from as wide and diverse sections of the public as possible. No social, political or economic section should be precluded by law from running for the Legislature without good reason. Any evil sought to be avoided by § 109 would become attenuated by prohibiting a prospective legislator from serving the public. Such, a prohibition, when balanced against the potential harm to our people, goes beyond any possible intent or purpose of this section. We cannot envision the authors of § 109, or the people of this State in 1984 and 1986, ever intending that employment of a wife in the capacity of Mrs. Nunnally would prevent the spouse from running for the Legislature, and if elected, serving in that branch of government.
The authors of § 109, and the people in rejecting the amendments thereto, may well have wondered how a state employee holding down a full-time job, in which he was paid the same salary as all other state employees similarly employed could find time to also serve in the Legislature. If a private business can afford for one of its members to serve in the legislature, that is one thing. A full-time employee of the state is something else. The employment of a Legislator's spouse as one of a large class of state employees poses no such threat.
The Ethics Commission cites cases from other jurisdictions wherein the highest courts of those states have held that contracts between a political subdivision and a family member of one of the governing board was a conflict of interest under a prohibition against such official being directly or indirectly interested in contracts with the political entity, and thereby voiding the contract. See Woodward v. City of Wakefield, 236 Mich. 417, 210 N.W. 322 (1926) (purchase of realty by city from mayor's wife); Harrison v. City of Elizabeth, 57 A. 132 (N.J. 1904) (city plumbing contract with business managed by councilman and owned by his mother); McElhinney v. City of Superior, 33 Neb. 744, 49 N.W. 705 (1891) (city contract with brother of councilman; Nuckols v. Lyle, 8 Idaho 589, 70 P. 401 (1902) (community property state; school trustee was interested in teaching contract between the school district and his wife); Nielsen v. Richards, 75 Cal. App. 680, 243 P. 697 (1925) (teaching contract held void between school district and wife of superintendent, where superintendent had authority to enter into teaching contracts).
The answer to the above cases cited by the Ethics Commission, of course, is that we are not confronted with such a situation here. This is not a case of Nunnally being on a school board of the district which employed his wife. He is in the Legislature. His wife is one of several thousand public school teachers in the state. There has been no case cited to us from any jurisdiction which suggests a possible conflict of interest because a Legislator's spouse is employed by the state, as one of a large class.
Whatever might be said of the logic supporting the contention that § 109 was violated because (1) Mr. Nunnally was in the Legislature, (2) which passed a law authorizing his wife's public school employment contract (3) in which he manifestly had some interest, it simply defies practical wisdom to carry this section to such an extreme. As Justice Brandeis once observed, "the logic of words should yield to the logic of realities." DiSanto v. Pennsylvania, 273 U.S. 34, 43, 47 S.Ct. 267, 71 L.Ed. 524, 529 (1927).
We must hold, therefore, that Anderson, Frazier and Nunnally have violated § 109, and the provisions of Miss. Code Ann. *699 § 25-4-105(3)(h) (Supp. 1985) which sought to authorize their dual employment was manifestly at odds with our Constitution and therefore void.
As to Mrs. Nunnally, we hold that § 109 was never intended to prohibit any individual from serving in the Legislature and voting on general public school laws simply because his or her spouse is employed as a public school teacher in this state.

LOGAN AND KILLEBREW
With these defendants we are faced with the question of whether they were members of boards which "authorized" their contracts. Logan maintains his contract was authorized by the Board of Trustees of the Long Beach Municipal Separate School District, not the city board of Long Beach. Similarly, Killebrew contends the Quitman County Board of Education authorized his contract and not the Quitman County Board of Supervisors.
It is true that school districts are agencies of the state, and have a separate and distinct identity from that of the city or county in which they are located. As we held in Harrell v. City of Jackson, 229 Miss. 815, 92 So.2d 240 (1957), trustees of municipal separate school districts, even though they may be appointed by the city board, are not agents of the municipality in carrying out their duties. Members of county school boards and, in some instances, trustees of a municipal separate school district are elected by statute. See: Miss. Code Ann. § 37-5-1 (1972), -7-203 (Supp. 1985); -7-207 (Supp. 1985).
It is also true, however, that school districts have no authority to levy taxes, but are dependent solely upon appropriations made by the state and municipality or county, as the case may be, of which they are a part. See: Miss.Code Ann;. §§ 37-19-37 (Supp. 1985); -19-39 (Supp. 1985); -57-1 (1972); -57-3 (1972); -57-105 (Supp. 1985).
Moreover, no school board may vote to spend funds not made available to it from state appropriations and local taxation.
In pertinent part, Miss. Code Ann. § 37-61-3 (1972) states:
§ 37-61-3. Use of school funds, generally.

The minimum education program funds of the county and municipal school districts and the funds derived from the supplemental school district tax levies authorized by law shall be used exclusively for the support, maintenance and operation of the schools in the manner provided by law for the fiscal years for which such funds were appropriated, collected, or otherwise made available, and no part of said funds shall be used in paying any expenses incurred during any preceding fiscal year. [Emphasis added]
Also, Miss. Code Ann. § 37-61-19 (1972) states in pertinent part:
§ 37-61-19. Expenditures shall be limited to budgeted amounts; personal liability for excess.
... It shall be the duty of the county boards of education, the county superintendents of education, and the boards of trustees of all school districts, including municipal separate school districts, in making or approving contracts for transportation, selecting, approving, contracting with, and fixing the salaries of superintendents, principals, and teachers, and in expending other available school funds or incurring obligations payable therefrom to limit the amount of such expenditures to the funds made available for such purposes during the fiscal year, and it shall be unlawful for any contract to be entered into or any obligation incurred or expenditure made in excess of the funds available for such purposes for such fiscal year. [Emphasis added]
See also Railroad School Township v. First State Bank, 73 Ind. App. 358, 126 N.E. 342, 344 (1920); Union Graded School Dist. No. 5 v. Ford, 169 Okl. 410, 37 P.2d 258, 259 (1934); Crosby v. P.L. Marguess & Co., 226 S.W.2d 461, 463 (Tex. 1950).
It therefore follows that a tax levy by a city board or county board of supervisors *700 serves the same function as an appropriation bill by the Legislature. The schools are dependent upon the tax levies and the state appropriation for their survival. A condition precedent to any expenditure by the school district is that sufficient funds have been made available to it by local taxation as well as state appropriation. Without them the teachers could not be paid.[22]
We are again reinforced in this interpretation by the action of the voters of this State in rejecting proposed amendments to § 109 which specifically would have made contracts such as Logan's and Killebrew's lawful. See proposed 1984 and 1986 amendments, supra.
We hold that where a portion of the salaries derived by public school teachers under their teaching contracts comes from discretionary local tax levies, a teacher cannot make a valid contract with a school district while he is on the board of the governing authority which makes such tax levies, or within one year after his term on the governing board expires. Such a contract violates § 109.
It therefore follows that insofar as Miss. Code Ann. § 25-4-105(3)(h) attempts to make an exception and authorize such a contract, it is at cross purposes with § 109 and unconstitutional.
As was aptly stated in Commonwealth v. Withers, 266 Ky. 29, 98 S.W.2d 24, 25 (1936):
It is a salutary doctrine that he who is intrusted with the business of others cannot be allowed to make such business as object of profit to himself. This is based upon principles of reason, of morality, and of public policy. These are principles of the common law and of equity which have been supplemented and made more emphatic by the foregoing and other statutory enactments.
The Supreme Court of Missouri in Githens v. Butler County, 350 Mo. 295, 165 S.W.2d 650 (1942), stated the general rule:
At common law and generally under statutory enactment, it is now established beyond question that a contract made by an officer of a municipality with himself, or in which he is interested, is contrary to public policy and tainted with illegality; and this rule applies whether such officer acts alone on behalf of the municipality, or as a member of a board of [or] council. * * * The fact that the interest of the offending officer in the invalid contract is indirect and is very small is immaterial. * * * It is impossible to lay down any general rule defining the nature of the interest of a municipal officer which comes within the operation of these principles. Any direct or indirect interest in the subject matter is sufficient to taint the contract with illegality, if the interest be such as to affect the judgment and conduct of the officer either in the making of the contract or in its performance. In general the disqualifying interest must be of a pecuniary or proprietary nature.
Id. at 652, citing 2 Dillon, Municipal Corporations, § 773.
Neither Logan nor Killebrew have properly assigned as error that the local tax levy provided such an insignificant part of their salaries as to be inconsequential and could not have affected their judgment as board members.

NO DISCRETION IN MAKING LEVY
Our inquiry as to Logan does not end with ruling Miss. Code Ann. § 25-4-105(3)(h) unconstitutional with respect to his contract. He also argues that the tax levy by the city board of Long Beach was mandatory and not a matter of discretion; therefore his contract did not violate § 109. We find this argument persuasive. Except *701 for the year 1985, all tax levies made by the city board of Long Beach were mandated by statute,[23] and in some instances by decree of the chancery court as well. It was only in 1985 that an undetermined sum of his salary, undoubtedly small, came from the local tax levy.
The Ethics Commission does not dispute that except for 1985, the tax levy by the municipality governing board was mandatory, but argues this makes no difference. We do not agree. We cannot envision penalizing a member of a public board for voting affirmatively on a matter in which a court decree or statute gave him no choice but to vote precisely as he did. In such instance, while his vote may be necessary to put into effect some official process, it is ministerial. Nor can we envision § 109 penalizing any individual for being on a board faced with such matter. Any evil envisioned by the authors of § 109 would have to come from a board member voting on a matter in which he had discretion to vote yes or no.
While it may have always been the case, most certainly in these times it is difficult to persuade many able men and women to serve in public office, particularly on governing boards of towns and counties. This is because such service frequently entails financial sacrifice, having to be away from the family, and receiving far more criticism than recognition or appreciation from the public they serve. It is no wonder many worthwhile citizens who could render invaluable public service are extremely reluctant to serve, indeed they frequently will not even consider it.
It is also in the interest of our state that members of governing boards of towns and counties come from all walks of life. It most assuredly was never the intent of the authors of § 109 to have this section applied to such an extreme as sought by the Ethics Commission. To do so would inflict grave and unnecessary wounds to the democratic process.
The Tennessee Supreme Court was faced with this same question in State ex rel. Boles v. Groce, 152 Tenn. 566, 280 S.W. 27 (1926), in which a public school teacher was also on the county's governing board which levied taxes to support the school. The Tennessee statute, like our Mississippi statutes, made such levies mandatory. That Court stated:
The county court [Tennessee's equivalent to our county board] has nothing to do with the fixing of salaries or the employment of teachers, and, should the board act contrary to its wishes in such matters, it has no power to review or supervise its action.

The county court necessarily has to levy a tax for creating needed school funds, because it is the only agency clothed with such power, and this duty is enjoined upon it by the state.
In view of the foregoing, we are of the opinion that the relator did not contract with the county within the spirit and intent of the statutes invoked.[24] [Emphasis added]
Id. at 28.
It therefore follows that our view as to Logan is that he was not in violation of § 109 in voting on tax levies for all years he served as a member of the city board of Long Beach, except for the year 1985.
As to Killebrew, the tax levy by the county was discretionary, and therefore he does not come within the exception in Logan's case for the years covered in this *702 case, and was in violation of § 109 as the chancery court found.[25]

KNOX
Regarding Knox we first deal with the question of whether or not he, as a county board member who selected the county depositories, has "authorized" that contract within the meaning of § 109. We hold he has. The entry of an order on the minutes of the county board of supervisors is essential to the validity of a contract. Burt v. Calhoun, 231 So.2d 496, 498 (Miss. 1970). The orders entered by the Panola County Board of Supervisors specifically stated that the board "will receive bids and award contracts for the privilege of keeping the county funds." Pursuant to these orders, two banks in which Knox was interested became county depositories. Therefore, it is clear that the order of the county board "authorized" these depository contracts.
Knox, however, urges that a county depository contract is a special animal not meant to be caged by the prophylactic standards of § 109. We must disagree with this interpretation, and we are reinforced in this belief by similar cases from other jurisdictions holding the same. See: Miller v. County of Lake, 71 Ill. App.3d 478, 27 Ill. Dec. 566, 389 N.E.2d 630 (1979), aff'd, 79 Ill.2d 481, 38 Ill.Dec. 798, 404 N.E.2d 222 (1980); City of Lincoln v. First Nat'l Bank of Lincoln, 146 Neb. 221, 19 N.W.2d 156 (1945).
In the City of Lincoln case, the Nebraska Supreme Court faced a situation closely akin to ours. The Lincoln City Council adopted a resolution designating three banks as the city depositories. A city councilman was a stockholder, director, and vice president of one of the banks. The City of Lincoln subsequently sought a declaratory judgment to determine if such a scenario was in violation of the city charter, which contained language identical to our § 109. The Nebraska court stated:
It seems clear under the circumstances that if a deposit in a bank is a contract and an officer of the city has an interest therein that such a contract comes squarely within the charter and statute... . This Court has held that the relation of banker and depositor can only be created by a contract express or implied... . The resolution of the council giving the city treasurer authority to deposit and the designation by the council of defendant bank and others as the sole and only depositories are only resolutions of the council. Such a resolution standing alone is not a contract... . The actual deposit of city funds as authorized in a designated bank creates the contractual relationship between the city and the particular bank in which the deposits are made.
19 N.W.2d at 158-59.
The City of Lincoln court stated further:
Manifestly the defendant is deriving a benefit or profit from the deposits of the city funds. The defendant in its answer so admitted. As a business institution it could not ordinarily be expected to receive and disburse so large an account without prospect of profit commensurate with the service required. Naturally, any person who was a stockholder, director or officer thereof would be both directly and indirectly financially interested in any contractual arrangement which returned a profit to his corporation. However, we call attention to the fact that if the contract is of a kind prohibited by law it is immaterial whether the officer of the city actually profited from the contract or whether he was actually influenced by his interest. The question is whether there was any contract to which the city or anyone for its benefit is a party in which the officer of the city was interested directly or indirectly by virtue of an opportunity to *703 benefit or profit therefrom. [Emphasis added]
19 N.W.2d at 159.
Knox contends that the history of our county depository law suggests that § 109 is inapplicable to the case before us. Specifically, Knox points to a 1924 statute which amended the implementing provision of § 109 and provided a statutory exception for county board members who held office or stock in banks that were potential county depositories. See: S.B. 471, Chapter 238, Laws of 1924. To this contention we simply state that the 1924 statute has never been construed in relation to § 109, and therefore it is irrelevant to the issue before us today. The sole question presented here is whether a county board member who is a stockholder, director, and officer of a bank, is prohibited by § 109 from authorizing a contract which makes that bank a county depository.
Finally, Knox argues that the creation of a county depository is not a contract but a quasi public office, citing Miller v. Batson, 160 Miss. 642, 134 So. 567 (1931). For the purposes of a "contract" under § 109, however, we adopt the view taken by the Nebraska Supreme Court in City of Lincoln, supra. See also the following cases suggesting the debtor-creditor relationship between the depository bank and the county: Sunflower County v. Bank of Drew, 136 Miss. 191, 101 So. 192 (1924); Robertson v. Bank of Batesville, 116 Miss. 501, 77 So. 318 (1919). See also: School Dist. of Prairie County v. Massie, 170 Ark. 222, 279 S.W. 993, 994 (1926); Taelman v. Board of Finance, 212 Ind. 26, 6 N.E.2d 557, 562 (1937); Mitchell v. Bank of Ava, 333 Mo. 1195, 65 S.W.2d 104, 106 (1933).

DISCRETIONARY AUTHORITY OF KNOX
As we have noted in Logan's case, an order passed by a board in which a board member has some interest is not a per se violation of § 109, absent some discretionary power by that board member. Although Knox asserts that the selection and qualification of county depositories is totally regulated by the statutory law of this State, we cannot ignore the fact that these statutes dealing with the selection and qualification of depositories vest total discretion in the county board of supervisors.
Miss. Code Ann. § 27-105-303 (Supp. 1985) provides in pertinent part:
... Where more than one (1) financial institution in a county offers to qualify as a depository, the board of supervisors may allocate such money to each financial institution offering to qualify as nearly as practicable in proportion to their respective net worth, and may adopt the rules for receiving such deposits. [Emphasis added]
We have previously stated that this provision is permissive, not mandatory, so that a county is not required to divide the funds equally between two equally qualified banks. Leflore Bank & Trust Co. v. Leflore County, 202 Miss. 552, 32 So.2d 744 (1947).
Miss. Code Ann. § 27-105-315 (Supp. 1985), which provides how banks may qualify as depositories, states that the board of supervisors shall have the right to reject any and all bids where, in the board's opinion, the bank has placed insufficient security on deposit. We have stated that this statute vests discretionary power in the board of supervisors. The Bank of McCool v. United States Fidelity & Guaranty Co., 128 Miss. 828, 91 So. 566 (1922).
From these statutes it is apparent that Knox had discretionary authority over the depository contracts he voted on.
Our analysis of Knox's conflict of interest is fortified by Miller v. County of Lake, 71 Ill. App.3d 478, 27 Ill.Dec. 566, 389 N.E.2d 630 (1979), aff'd, 79 Ill.2d 481, 38 Ill.Dec. 798, 404 N.E.2d 222 (1980). Miller was a county board member who voted to designate a bank (in which he owned stock and was later a director) as an approved county depository. The trial court accepted Miller's argument that the county board merely approved the contracts for the county treasurer, who entered into the deposit contract. The Illinois Court of Appeals reversed, noting that a county treasurer would be reluctant to deposit county *704 funds in non-designated banks due to possible exposure to personal liability. The appellate court remanded the cause for an evidentiary hearing to determine whether the designation of county depositories by the board was a "perfunctory act."[26]Miller v. County of Lake, 27 Ill.Dec. at 571, 389 N.E.2d at 635. If, however, the designation of banks was not ministerial, the contracts of deposit would be void. On appeal the Illinois Supreme Court affirmed. Miller v. County of Lake, 79 Ill.2d 481, 38 Ill.Dec. 798, 404 N.E.2d 222 (1980).
In the situation before us, there is no question of whether or not Knox's action was a "perfunctory act." Our state abolished the office of county treasurer in 1924, and since that time the county boards and municipal boards have exercised their full discretion in awarding county depository contracts.
Knox makes no de minimis argument nor does he contend that any benefit he might have received was too speculative and remote to suggest a violation of § 109. See McCloud v. City of Cadiz, 548 S.W.2d 158 (Ky.App. 1977). However, we are not dissuaded from our original conclusions in view of Knox's position of stockholder, officer, and director of the two banks. See 140 A.L.R. 343, 349 (1942): "A stronger case of interest exists where public officers are not only stockholders, ... but also officers of corporations with which the public has attempted to enter into a contract."
It follows that Knox, as a county board member who authorized depository contracts between the county board and banks in which he was an officer and a stockholder, was in violation of § 109. To the extent that Miss. Code Ann. § 25-4-105(3)(a) attempts to provide for an exception to § 109, it is in conflict and therefore unconstitutional.

CROSS-APPEAL
The Ethics Commission's cross-appeal alleges error because the chancellor did not require restitution from the defendants for compensation received in violation of § 109.
In Golden v. Thompson, 194 Miss. 241, 11 So.2d 906 (1942), we adopted the view that a public official who, in the performance of his duty, acted in good faith reliance upon a statute before it had been declared unconstitutional by a Court should not be held civilly liable for conduct authorized by such statute. The chancellor found no bad faith on the part of any of the defendants in their misplaced reliance on the condemned sections, and we cannot say he was manifestly wrong in such finding. On cross-appeal the chancery court judgment should be affirmed.

CONCLUSION
As we have noted, Miss. Code Ann. § 25-4-105(3)(h) insofar as it authorizes legislators to be employed by a state-financed agency other than the Legislative body of which they are members is unconstitutional and void. We further find that Frazier and Anderson were in violation of Article 4, Section 109 by virtue of their serving in the Legislature and also being employed on the faculty of a state-supported university.
*705 The declaratory judgment as to them is affirmed.
As to Nunnally we likewise find that he was in violation of Article 4, Section 109 by virtue of serving in the Legislature and also being employed as a public school teacher. It follows that the declaratory judgment as to Nunnally's dual employment is affirmed.
Insofar as the judgment against Nunnally was based upon his wife being employed as a public school teacher, however, the chancellor erred, and as to this finding the judgment is reversed. The employment of Mrs. Nunnally as a public school teacher while Nunnally served in the Legislature was not a violation of Section 109.
As to Logan and Killebrew, we likewise find that insofar as Miss. Code Ann. § 25-4-105(3)(h) authorized either of them to be employed by a political subdivision and simultaneously serve on the governing board of another political subdivision with discretionary authority to vote tax levies for the support of the political subdivision by which they are employed is unconstitutional and void. We further find that Killebrew, in serving upon the Board of Supervisors of Quitman County with discretionary authority to levy ad valorem taxes for the support of the Quitman County School District while employed as a public teacher in that school district, was in violation of Article 4, Section 109, and the judgment as to him is affirmed.
We further find that Logan, in serving upon the city board of Long Beach in 1985 when it levied a discretionary ad valorem tax levy of 3.95 mills for the support of the public schools of the Long Beach Municipal Separate School District, while at the same time being employed as a public school principal in that school district was in violation of Article 4, Section 109, and the judgment in finding him in violation of this section for that year is affirmed.
Insofar as the chancery court found Logan in violation of Section 109 for the years 1982, 1983 and 1984, however, the chancellor erred, and as to this finding the judgment is reversed. Logan was not in violation of § 109 for these years, because the city board was required by law to make the tax levy actually levied.
As to Knox we find that insofar as the provisions of Miss. Code Ann. § 25-4-103(3)(a) authorized the contract between the banks in which he was an officer and a stockholder, and Panola County when he was a member of the Board of Supervisors, is unconstitutional and void. Finally, we find that Knox, in serving as a member of the Board of Supervisors of Panola County which contracted with the bank of which he was an officer and stockholder, was in violation of Section 109, and the judgment as to him is affirmed.

RELIEF
As held in Alexander v. State by and through Allain, 441 So.2d 1329 (Miss. 1983), in affirming the final judgment the chancery court rendered in accordance with Rule 57 of the Mississippi Rules of Civil Procedure, there can be little doubt of this Court's authority to give the judgment immediate effect.
Also, as in Alexander, we note these public officials are not ordinary litigants. As was the case in State ex rel. Settles v. Board of Education of Dependent School District No. D-38, 389 P.2d 356 (Okla. 1964), undoubtedly since the inception of our Constitution there have been times when Legislators were also actively employed in some state-financed institution.
We likewise entertain little doubt that at least since the passage of S.B. 471, Chapter 238, Laws of 1924, there have been occasions when a member of a county board of supervisors also was an officer and a stockholder in a bank selected as a county depository by the board.
Public school teachers may also from time to time have served on the boards of supervisors or boards of aldermen of counties and municipalities which levied taxes to support their respective school districts.
We also observe that this is election year for all defendants except Logan, and it would cause an unnecessary disruption by giving immediate effect to this judgment, requiring special elections to fill vacancies *706 in public offices for a period of only a few months.
We therefore have provided that this declaratory judgment shall be of no force and effect until January 1, 1988.
It is our further conclusion that Frazier, Anderson and Nunnally should not be disqualified under the case here presented from seeking employment at state-financed institutions for the 1987-1988 school year, beginning July 1, 1987, while at the same time serving in the Legislature, but if they elect to do so, it should be understood that service in the Legislature for the term beginning January 4, 1988, will invalidate any such contract of employment they have, for the reasons stated in this opinion.
As to Logan and Killebrew, we also find that their service on the Long Beach city board and the Quitman County board of supervisors, respectively, will not prevent their seeking employment in their respective school districts for the 1987-1988 school year, beginning July 1, 1987, but service on either board when it makes a discretionary tax levy for support of such school district will constitute a violation of Section 109 and invalidate their public school contracts.
As to Knox, the depository contracts between the county and the two banks in which he is an officer and stockholder shall remain valid for the 1987 year. However, the selection and qualification of these county depositories for any future contracts while Knox is a member of the county board will constitute a violation of § 109 and invalidate these contracts.
Insofar as the chancery court judgment found Nunnally to be in violation of Section 109 because his wife had a contract of employment as a public school teacher, and Logan in violation of Section 109 for the years 1982, 1983, and 1984, it is hereby vacated.
AFFIRMED IN PART, REVERSED AND RENDERED IN PART ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, and GRIFFIN, JJ., concur.
ROBERTSON, SULLIVAN and ANDERSON, JJ., concur in part and dissent in part and file three separate opinions.
PRATHER, J., specially concurs.
ROBERTSON, Justice, concurring in part, dissenting in part

I. An Air of Unreality

There is a certain air of unreality about this case. The impression is about that a strict construction of Section 109 necessitates affirmance, notwithstanding this result may in fact only be reached via an expansive reading of the key Section 109 wording, a point I understand the majority to concede. Guidelines to the exercise of our undoubted authority of judicial review of legislative enactments, guidelines established in literally hundreds of cases spanning more than a hundred years, most thoroughly entrenched in our law and most assuredly pointing to reversal as to all Appellants except Supervisor Knox, are inexplicably ignored as though they had no existence.
The public perceives that Section 109 proscribes all conflicts of interest in state and local government. In truth and in fact, there are untouched by Section 109 potential public official conflicts far more inimical to the public weal than those challenged here. Indeed, the suggestion that the public coffers most need protection from the self-interest of poorly but publicly paid legislator-school teachers strains credulity.
And because the "conflict-of-interest" label has been attached to Section 109, much of the argument for affirmance proceeds upon the value judgment that such-and-such is a conflict of interest, generic variety, notwithstanding that a fair reading and application of the rather restrictive wording of the constitution produces no illegality. Indeed, I am struck by the penchant of all  the majority and the parties  for reading into Section 109 wording that simply is not there.
*707 One may search the majority opinion in vain for a neutral, non-result oriented reading of Section 109 which when applied will yield the crazy quilt of results we announce today. Section 109 (once well expanded) is "relentlessly severe" when applied to the activities of legislator-public school teachers but must be "balanced" with the "logic of realities" when applied to legislators' school teacher wives. Severity qua formalistic jurisprudence returns in the case of the school teacher-supervisor payment of whose salary is traceable to discretionary local tax levies, only to give way again to practical reality regarding a school teacher-alderman where the board of aldermen was mandated to fund the school budget. The majority is quixotic and schizophrenic at once.
I suggest, with deference to my colleagues, that today's decision would fare poorly under the grading pencil of persons competent in linguistics, ethics, logic and political science. It isn't very good law either.

II. On Reading Section 109

A. The Best Fit The Wording May Be Given

Section 109 reads:
No public officer or member of the legislature shall be interested, directly or indirectly, in any contract with the state, or any district, county, city, or town thereof, authorized by any law passed or order made by any board of which he may be or may have been a member, during the term for which he shall have been chosen, or within one year after the expiration of such term. [Emphasis supplied]
On our oaths we must apply these words as best fits their common and ordinary meaning, our referents being the work of Noah Webster and Henry Campbell Black more than 1890's constitutional draftsmen. We have no interest in what the constitution makers intended, except insofar as that intent may be divined from the words employed, because in substantial part there is no other method of the remotest reliability of ascertaining the makers' intent.[1] Moreover, our state has changed since 1890. As it is a constitution we expound, McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579, 610 (1819), we should read and apply Section 109 in the manner which best fits its language and best serves our state today. See Alexander v. Allain, 441 So.2d 1329, 1334 (Miss. 1983); Stepp v. State, 202 Miss. 725, 729-30, 735-36, 32 So.2d 447, 447-48, 33 So.2d 307, 309 (1948); Albritton v. City of Winona, 181 Miss. 75, 102-03, 178 So. 799, 806 (1938).

B. The (Inexplicably Ignored) Correct Canons of Construction

Our reading of Section 109 today is in a special context. Our constituent assembly has enacted implementing legislation which we are told exceeds its constitutional authority. Today's case is wholly unlike Cassibry v. State, 404 So.2d 1360 (Miss. 1981), relied upon so heavily by the majority, for nothing regarding the Section 109 question in Cassibry asked the Court to declare legislation unconstitutional and thus void.
The majority recites at the outset of its opinion the legislative enactments which standing alone undoubtedly render legal the actions of the majority of the Appellants here. Inexplicably the majority then proceeds to analyze the conduct and activities of these Appellants wholly ignoring that judicial review of legislative action calls to bear wholly different ground rules. Specifically, the majority asks the question whether Sen. Anderson, Reps. Frazier and Nunnally, et al., have engaged in conduct which offends Section 109 of the Constitution. The correct method of analysis, however, is to consider first whether the conduct of these legislators violates the statute and, upon the inescapable determination that there is no statutory violation, we should ask whether in whole or in part the *708 statutory scheme, not the conduct of individuals, offends Section 109.
Without doubt, our constitutional scheme contemplates the power of judicial review of legislative enactments. Alexander v. State ex rel. Allain, 441 So.2d 1329, 1333 (Miss. 1983). That power may be exercised affirmatively, however, only where the legislation under review be found
in palpable conflict with some plain provision of the... constitution.[2]
Hart v. State, 87 Miss. 171, 176, 39 So. 523, 524 (1905). The unconstitutionality of a statute must be made to appear beyond all reasonable doubt before this Court has authority to hold the statute, in whole or in part, of no force or effect. See, e.g., Mississippi Power Co. v. Goudy, 459 So.2d 257, 263, 274 (Miss. 1984); Anderson v. Fred Wagner & Roy Anderson, Jr., Inc., 402 So.2d 320, 321 (Miss. 1981); Clark v. State ex rel. Mississippi State Medical Association, 381 So.2d 1046, 1048 (Miss. 1980); Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938); Miller v. State, 130 Miss. 564, 585, 94 So. 706, 709 (1923). To state that there is doubt regarding the constitutionality of an act is per force to declare it constitutionally valid. Ivy v. Robertson, 220 Miss. 364, 370, 70 So.2d 862, 865 (1954); Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938); State ex rel. Greaves v. Henry, 87 Miss. 125, 143, 40 So. 152, 154 (1906).
The point is put otherwise. We have dozens of cases stating, often without citation of authority because the point is so clear, that statutes are presumed constitutional, albeit rebuttably so. See, e.g., Mississippi Power Co. v. Goudy, 459 So.2d 257, 263 (Miss. 1984); Hart v. State, 87 Miss. 171, 176-77, 39 So. 523, 524 (1905). This presumption is not idly accorded. It is based in the fact that a statute such as Section 25-4-105 comes before this Court
sustained and authenticated by the sanction and approval of two of the three great departments of state government.
Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938). See also Fullilove v. Klutznick, 448 U.S. 448, 473, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902, 920-21 (1980).
The legislators who have enacted the statute here under review have taken the same oath as have we to uphold and support the Constitution. See Alexander v. State ex rel. Allain, 441 So.2d 1329, 1347 (Miss. 1983); see also Rostker v. Goldberg, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478, 486 (1981).
It has long been settled in this state that, when the constitutionality of a statute is drawn into question, a construction will be placed upon it, if reasonably possible, to enable it to withstand the constitutional attack and to carry out the purpose embedded in the legislative language. Chassanoil v. City of Greenwood, 166 Miss. 848, 860, 148 So. 781, 783 (1933); see also State ex rel. Greaves v. Henry, 87 Miss. 125, 143-44, 40 So. 152, 154 (1906); Hart v. State, 87 Miss. 171, 176-77, 39 So. 523, 524 (1905); Burnham v. Sumner, 50 Miss. 517, 520-21 (1874). A like approach applies to the construction of the open-textured language of constitutional provisions such as Section 109; that is, out of deference to the authority and prerogatives of the legislature, we will ordinarily afford the gray areas of the constitution any reasonable construction that will avoid unconstitutionality of the statute. Miller v. State, 130 Miss. 564, 585, 94 So. 706, 709 (1923).[3] This is for the obvious reason that the propriety, wisdom and expediency of a statutory enactment is a question for the legislature, not this Court. Anderson v. Fred Wagner & *709 Roy Anderson, Jr., Inc., 402 So.2d 320, 321 (Miss. 1981); Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938).
In the final analysis we recognize that in cases such as those presented today we confront the exercise of our authority in a context which requires the utmost delicacy. Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206, 210 (1927) (Holmes, J.). We should proceed with caution, Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938); State ex rel. Greaves v. Henry, 87 Miss. 125, 144, 40 So. 152, 154 (1906), and accord all weight due the decisions of the legislature by virtue of the existence of that body as a co-equal branch of the government. See Rostker v. Goldberg, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478, 486 (1981); Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973). We exercise our authority of judicial review remembering that
legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.
Missouri, Kansas & Texas Railway Co. v. May, 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971, 973 (1904).
When enactments of a legislature
relate to matters of general interest, and can be vindicated under express or justly implied powers, .. ., disposition in the judiciary should be strong to upheld them.
Planters' Bank of Mississippi v. Sharp, 47 U.S. (6 How.) 301, 319, 12 L.Ed. 447, 455 (1848). Put otherwise, we are obliged to proceed "with sympathetic regard for the work of the lawmaking department of our government." State ex rel. Forman v. Wheatley, 113 Miss. 555, 589, 74 So. 427, 429 (1917).

C. The Majority's Erroneous Approach to Construction

On one point there seems no doubt. The clear wording of Miss. Code Ann. § 25-4-105(2) and (3) (Supp. 1986) renders lawful the public service of Sen. Anderson, of Reps. Frazier and Nunnally, and of Supervisor Killebrew. The case for affirmance must proceed on the premise that this statute is in relevant part unconstitutional. And, indeed, on page 46 the majority concludes that in part the statute is so defective. Its methodology en route is unusual.
To begin with, the majority provides a discussion entitled "Interpretation Guidelines." See pp. 694-695. I have described what is missing that ought be there in Part B above. I am as much disturbed by what I find there as by what is missing.
I suppose the majority's sidestep of the accepted canons of construction applicable in cases of judicial review is to be found in its declaration that Section 109 is "self-executing." (p. 694) What follows belies that declaration as the majority labels "gray areas" the two key parts of Section 109: "interested, directly or indirectly" and "authorized," and proceeds with its alternately formalistic and realistic construction, depending upon who is the Appellant at risk, demonstrating quite convincingly that Section 109 is anything but self-executing.
The majority does something else odd. Much is made of the failed 1984 and 1986 amendments to Section 109, (pp. 684-685, 695, 697, 698) as though somehow meaning has been accorded the wording that remains. I know of no legal doctrine or principle that accords weight to an unsuccessful effort to amend a law, and the majority cites none. I could as well argue that the voters have expressly ratified the circumstances of Sen. Anderson and Rep. Nunnally, for the fact that each was a teacher was well known to the voters at the time each last stood for reelection.[4] I *710 make no such argument, of course, for I know it legally as specious as the majority's point.
In the majority opinion, page 695, the interpretive process is turned on its head. We are admonished to construe Section 109 "in accordance with the plain meaning of its words... ." Page 695. So far so good. But the sentence ends "... so long as it bears some relationship to this purpose." Think about this. The majority says, follow the words of Section 109  so long as they "bear some relationship to this purpose," and, presumably, then abandon (or expand) the section's wording. But to what purpose? Whence gathered?
The error here  and it is quite fundamental  is in the premise that the "purpose" has some independent, prior extra-legal existence which modifies the "plain meaning" of the words of Section 109. What the majority is saying is that it accepts certain value judgments as having the power to modify the constitution, notwithstanding its inability to find those value judgments in that constitution. The majority drives home the point by its amazing injunction that the wording of Section 109 should not be given some "abstractly valid meaning" where this would "cause grave risks to be imposed on the sound government of the people." This Court has authority to construe the constitution to proscribe the grave risks proscribed by the constitution and none other. What the majority does in the end is act upon its subjective perception of grave risks which
(a) are not identified or proscribed by the plain wording of Section 109,
(b) are not identified by reference to any authoritative source regarding the history of the wording of Section 109  not one word in the majority opinion points to any legitimate source of constitutional history suggesting that so much as a single delegate to the 1890 constitutional convention entertained the thought Section 109 means what we today say it means, and
(c) are not supported by one word in the record before us.
The majority's reading of Section 109 is based in quicksand.
My point is simple. We begin the enterprise of interpreting the constitution with its ratified meaning. We give that wording the most enlightened and coherent reading it may be given. That reading must not only fit the wording, it should provide the best fit. And that fit must be tailored today. But we dishonor the constitution qua law when we resort to subjective value judgments and ephemeral notions of grave risks which may not be found contemplated or incorporated within a fair reading of the constitution. This is particularly so when identification of and proof of the reality of those risks is found in no authoritative historical source nor in the evidence before us or within our judicial knowledge.
Finally, one of the great and seemingly eternal wars among legal scholars has been fought between so-called formalists or objectivists, on the one side, and realists or criticalists, on the other. Admittedly oversimplified, the central issue in that war has been whether law should be seen as a mass of hard edged, case decider rules which once identified and applied, produce automatic ("self-executing") results, or is law a sociological phenomenon practiced through identification of and balancing of interests and the exercise of judgment and discretion. Legal scholars on each side have expended passion and risked careers and professional reputations in this war. For the most part the two camps have found themselves on common turf about as often as Arab and Israeli, and about as congenially, although over a lifetime an occasional ambivalent jurist has waivered between the magnetic tensions of the two poles. All *711 of which is to provide context for my thought that the majority's opinion is striking in its formalistic march up the hill to affirm the cases of Appellants Anderson, Frazier, Nunnally, followed by a march back down to realism in the case of Nunnally's wife, then back up the hill to formalism to nail Killebrew and, back down to realism for Logan. I don't think I've ever seen such in a single opinion, nor as much.

III. Law

A. Today's Best Fit For The Section 109 Term: "Authorized"

I will be the first to concede that identification of and employment of the correct canons of construction, as in Part II(B) above, do not lead inexorably to reversal. They suggest an attitude, an approach, calling for skill and non-result oriented judgment in handling. They provide, one might say, a home court advantage for legislation judicially attacked. These Appellants have been denied that home court advantage, although they are of right entitled to it. Even so, all except Supervisor Knox should be accorded a road victory.
Assuming arguendo that the "interest" test of Section 109 be met,[5] the argument for affirmance, even without benefit of the home court advantage accorded by correct canons of construction, founders on the word "authorized." That is, before these public officials may be found in violation of the constitutional injunction, we must find them interested in contracts "authorized" by action of the board or other political body in which they serve. As the visiting team they are entitled to have the word "authorized" fairly construed.
The word "authorized," and the concept of authority, have familiar meanings. They import notions of legal power. One has authority regarding a matter not merely when as a practical matter he may act with effect but when some valid law provides that, if he so acts, no one may of right complain or interfere. Authority connotes the lawful delegation of power by one legal entity to another. Black's Law Dictionary 168 (4th ed. 1957). One "authorized" to act is one possessed of authority, that is, possessed of legal or rightful power." Id. at 169.
How then do "contracts" become "authorized" within the best fit meaning of Section 109? The answer is found in identifying the legal entity which is legally empowered to obligate each contracting party to the terms of the contract. A twofold inquiry ensues. In what legal entity has our law invested the legal power to enter the contract? That is, whose action is a sine qua non to a successful breach or enforcement action? Second, has the legal entity having authority taken steps sufficient that the contract has in fact been legally authorized?
Sen. Douglas L. Anderson and Rep. Hillman T. Frazier have contracts with the Board of Trustees of Institutions of Higher Learning. Those contracts have been authorized by the Trustees in the dual sense that
(a) without the Trustees' action the contracts would not be enforceable by Anderson or Frazier and (b) no other legal person or entity has any legal power to render the contract enforceable in the absence of the Trustees' approval.
The specific Section 109 question becomes, have Sen. Anderson and Rep. Frazier been interested in a contract "authorized by any law passed or order made by any board of which he may ... have been a member... .?" On the facts before us, the answer is inescapably "No." The only legal entity that authorized, or that had authority to authorize, the contract was the Board of Trustees. There is no evidence before us that either Anderson or Frazier is or ever has been a member of the Board of Trustees.
*712 Conversely, neither the Senate, of which Anderson is a member, nor the House of Representatives, of which Frazier has been and is a member, has authorized either contract. That is, neither the Senate nor the House of Representatives has taken any action which has obligated anyone to perform the duties owing to Frazier by virtue of the contract. More fundamentally, we have no law which vests in the Senate or the House of Representatives (with or without the concurrence of the other house) any authority to render the contract duties owing to Anderson and Frazier enforceable by them. This is for the reason that the self-same constitution in Section 213-A thereof provides that the Board of Trustees "shall have the power and authority to ... contract with all ... professors... ." Nothing in the constitution directs that this authority be shared, nor has the legislature made any attempt to share it.
At the risk of belaboring the point, there was and is only one legal entity which had and has the authority to make legally enforceable contracts with Sen. Anderson and Rep. Frazier: the Board of Trustees. That same Board had exclusive lawful authority to decline to contract with Anderson and Frazier, or either of them, and has such exclusive authority to refuse to contract anew. The cynics note that as legislators Anderson and Frazier have clout they may exercise to motivate the Board of Trustees in the performance of their contracting duties. No doubt in some ephemeral sense this is true, although we know of no way Anderson may cause the Board or any state university to be affected without concurrence of at least 26 other senators, each of whom is answerable to a constituency over which Anderson has no effective control and none of whom has a reputation for being bashful. And Frazier would need concurrence of 61 other representatives. Moreover, the constitution mandates in Section 213-A that the Trustees shall perform their duties "uninfluenced by any political considerations." We normally presume that public officials perform their lawful duties, at least in the absence of evidence to the contrary. Harris v. Harrison County Board of Supervisors, 366 So.2d 651, 655-56 (Miss. 1979); Raper v. State, 317 So.2d 709, 712-13 (Miss. 1975). Such a presumption here is not nearly so fanciful as many in which we have indulged in other contexts. See McElroy, Mississippi Evidence § 13 (1955). Moreover, there is no evidence in the record before us that the Board or any of its Trustees has violated this duty.
The majority's retort is that, even though the legislature has no legal power to authorize or enter a contract with Anderson or Frazier to teach at Jackson State, it "funds" contracts the Board authorizes. Funding is said to be tantamount to authorization. There are many problems with this argument, not the least of which is that neither Mr. Webster nor Mr. Black has ever defined "authorized" to include "funded," nor vice versa. Beyond this, the legislature makes an annual appropriation to the Board of Trustees. The legislature has no lawful authority to require that the Board spend that money in any particular way. More specifically, the legislature has no authority to require that the Board direct Jackson State to employ Anderson or Frazier and to pay either of them any particular salary. The suggestion that "authorized" encompasses "funded" purely and simply violates the rule of "best fit." Funding is not a meaning that fits the word "authorized."
The best that may fairly be said is that passage of an appropriations bill "indirectly" authorizes a public employee's contract, yet the very wording of Section 109 enjoins this construction. The draftsmen of Section 109 were conversant with words and concepts like "direct" and "indirect" for they included within the section's scope direct and indirect interests. "No ... legislat[or] shall be interested, directly or indirectly...." If funding had been thought within "authorized," it would seem that like language would have been employed. The draftsmen would have inserted, following the word "authorized" the phrase "directly or indirectly." Those words are not there. Herein lies one of many ironies of the majority opinion. The language of Section *713 109 mandates an expansive reading of "interest;" we read "interest" narrowly. On the other hand, the language contains nothing suggesting an expansive reading of "authorized," and canons of construction noted above in the context of today's case suggest a narrow reading. Again the majority does the opposite.
The best reading we may give the complete Section 109 is that interests direct and indirect are proscribed while only direct authorization is contemplated. Legislative appropriations to the college board or to school districts whose boards in turn authorize contracts with teachers are simply not within a fair reading of Section 109 as it is (as distinguished from as some, for reasons that elude me, wish it were).
The majority relies on an Oklahoma case for the proposition that a legislative appropriation bill "authorizes" a school teacher's contract. State v. Board of Education of Dependent School District No. D-38, 389 P.2d 356, 359 (Okla. 1964). With no disrespect for the Oklahoma court, I would point to New Mexico which provides the opposite: that "the contract of employment [of the legislator/school supervisor] was not authorized by the appropriation bill." State ex rel. Baca v. Otero, 33 N.M. 310, 267 P. 68, 69 (1928). All non-Mississippi precedents,[6] however, fade in the context of appropriate analysis of the language of our Section 109.
There is another point. Assuming arguendo, that "authorize" includes funding, what is it that the legislature votes to authorize when it passes appropriations bills for our public educational institutions? Not these contracts. To come within Section 109, those bills must authorize the "contracts" of Sen. Anderson, et al. Those contracts, of course, are in no way before the legislature when it considers the annual appropriations requests for public education. Those contracts at that time aren't even in existence. As explained above, there is nothing in the making of those appropriations that suggests these contracts will ever have legal existence. Even if legislative funding authorizes something, that something does not include the contracts with these legislator-educators, unless of course one reads Section 109 far more expansively than the law allows. Even the visiting team is entitled to have the rules applied according to their plain meaning, especially when of right it was entitled to the home court advantage.

B. Cassibry v. State  The Mule Case

But, the reader may ask, what about Cassibry v. State, 404 So.2d 1360 (Miss. 1981)? What has been presented above may be quite persuasive, the meaning of "authorized" considered as an original proposition, but did not Cassibry decide the point otherwise? The answer is four fold.
First, the majority acknowledges that Cassibry "scored a bulls-eye" while most of today's cases (excepting, presumably, that of Supervisor Knox) "do indeed approach the edge of the target." (See majority opinion, p. 695) Cassibry at best suggests a direction.
Second, nothing in Cassibry called upon this Court to consider whether conflict-of-interest legislation and activities of public officials concededly lawful thereunder contravened Section 109 of our constitution. Sen. Cassibry was able to point to no statute and argue that it legitimated his blatant conflict of interest. Cassibry was not a judicial review case. The Court thus was not called upon to adopt that special attitude of deference toward rules of law enacted by the legislature and approved by the governor.
Third, insofar as Cassibry may be said to stand for the proposition that "authorized" should be said to include "funded," its correctness is quite dubious. Certainly nothing in Colbert v. State, 86 Miss. 769, 39 So. 65 (1905); nor State Ex Rel. Barron v. Cole, 81 Miss. 174, 32 So. 314 (1902), relied *714 upon in Cassibry and cited here supports such a view. Those cases merely hold that no state agency may expend monies without benefit of a prior legislative appropriation. Nothing in Colbert or Cole mentions Section 109 or in any way changes the general common sense meaning of the word "authorize." Indeed, Colbert makes clear that very point I make: "The creation of a debt is an entirely different thing from an appropriation for its payment." 86 Miss. at 779, 39 So. at 67. In this sense Sen. Anderson's contract with the Board of Trustees creates a debt in his favor, subject, of course, to his performance of his side of the bargain. In the same sense Rep. Nunnally's contract with the Benton County Board of Education creates a debt in Nunnally's favor. The creation of these debts is, as Colbert says, "entirely different ... from an appropriation for [their] ... payment." 86 Miss. at 779, 39 So. at 67.
Moreover, Cassibry notes that Oklahoma and South Dakota have construed their constitutional equivalents of Section 109 as the majority does here, but acknowledges that New Mexico has reached the opposite conclusion. Cassibry never explains why it considers Oklahoma and South Dakota to have the better view. The analysis in Part A above shows the Cassibry holding erroneous  and reveals it a result-oriented decision premised far more in value judgments than in law.
Fourth and finally, Cassibry concerned a criminal prosecution under a statute, Miss. Code Ann. § 97-11-19 (Supp. 1975). Any mention of Section 109 was per force pure dicta. Added is that fact that the statute was repealed in 1983, before either of the present actions was commenced. See Miss. Laws, ch. 469, § 10 (1983). Cassibry is a mule case, one that should have no progeny.

IV. Value Judgments

But the cry remains, it is wrong for a public officer, in this instance a legislator, to vote on appropriations that will ultimately be used in whole or in part to pay his salary. Here the argument steps outside permissible legal reasoning and enters the arena of value judgments. The argument proceeds not on the basis of what the law is or even what it is in the process of becoming, but what the lawyers wish it were notwithstanding the absence of language in Section 109 which may undergird that wish. The constitution makers, whom we presume familiar with the English language, could have written Section 109 so that a legislator was prohibited from voting on an appropriation from which his salary would ultimately be paid, but they didn't. So long as there exists between the legislator and his paycheck an independent authority, a buffer zone, if you will, which the legislature has no lawful power to invade or control, Section 109 fairly construed is simply not offended.
In our system of law only value judgments[7] of a very special kind may inform judicial decisions. Those are the value judgments which have been incorporated into our law by the authority of some agency  constitutional convention, legislative, the judiciary, etc.  duly authorized in the premises. We cling to this fundamental proposition for the rather basic reason that people's value judgments differ, as the *715 present cases make apparent. The value judgment that, a legally independent buffer zone notwithstanding, no legislator should be allowed to receive a salary traceable back to an appropriation approved by the body of which he is a member is simply not a value judgment which may be found within a fair reading of the language of our law.
Certainly law is a purposeful enterprise subjecting human conduct to the governance of rules. See Warren County Board of Education v. Wilkinson, 500 So.2d 455, 460 (Miss. 1986). But we begin with the language of the rules and seek to divine purpose therefrom. The rule at issue, of course, is Section 109. To affirm we would have to turn this proposition upon its head and begin with a definition of purpose, inevitably a value judgment, and forge a rule to fit that purpose, whether our positive law contain such a rule or not. This I have always thought the essence of alegality which when practiced has been justly condemned by those familiar with our law. Yet in its stretching of the word and concept "authorized" to include "funding," this is precisely what the majority opinion has done.

V. Is There A Better Reading Section 109 May Be Given: Herein of the Judicial Peek Out the Window

A. The View Before Construction

We have demonstrated above that the majority has given an expansive reading to the word and concept "authorized" without which it could not affirm the judgment below in the cases of Sen. Anderson, Reps. Frazier and Nunnally and Supervisor Knox. I trust we have exploded the myth I find inexplicable  that reading and construing Section 109 strictly leads to affirmance. Quite the opposite is so.
There remains the proposition that constitutions are not static, that their words and provisions must possess capacity to evolve in meaning, for a constitution must be capable of ordering human affairs for many years beyond the moment of ratification. Alexander v. Allain, 441 So.2d 1329, 1334 (Miss. 1983); Albritton v. City of Winona, 181 Miss. 75, 102-03, 178 So. 799, 806 (1938). More precisely, notwithstanding the plain and ordinary meaning of the concept and word "authorized," are there broadly perceived societal circumstances sufficient that we force the evolution of "authorized" to proscribe the public official conduct here challenged? In the context of the approach to construction outlined above, and notwithstanding demonstration that one plausible fit of the concept and word "authorized" precludes the interpretation accepted by the majority, is there nevertheless a better fit  one which would lead to affirmance  undergirded by a statewide shared sense of appropriateness so that we should now by authoritative construction engraft it upon the 97 year old wording of Section 109? I think not.
Where is the adverse effect upon the public interest in the service by Sen. Anderson and Rep. Frazier in the legislature while they also serve as paid faculty members at Jackson State University (under contracts authorized by the Board of Trustees legally independent of the authority of the legislature)? Is there evidence that either neglected performance of his duties as a college professor? Not in this record. The same as to Rep. Nunnally and Supervisor Killebrew. Accepting that this is a test case, is there evidence that other legislators and other public officials who teach have been neglectful or in any way substandard in the performance of teaching duties they have been contractually obligated to perform and for which they are paid? Not in this record.
Is there evidence that Sen. Anderson or Rep. Frazier or Rep. Nunnally or Supervisor Killebrew have used their clout to obtain salaries over and above those paid others with similar qualifications? Not in this record. Is there evidence that other *716 legislators who teach have been paid salaries higher than those they could command were they not legislators? Not in today's record. Is there evidence that the legislature has funded the state institutions of higher learning or the public schools at a level in excess of that required by the public interest? Not in this record.
Where in this record  or within facts susceptible of judicial knowledge  is there evidence suggesting that we reject the demonstrably plausible fit of the concept and word "authorized" and fashion a new fit?
Not only is the answer to these questions in the negative but their mere asking suggests converse questions. Are there circumstances suggesting that the plausible fit described above is indeed the best we could fashion in light of today's Mississippi? I think so.
First, as all know our publicly supported educational institutions are engaged in a desperate struggle to keep competent faculty members. Teaching salaries are so low  when compared to what teachers at all levels are paid in other states and when compared to the salaries most Mississippi teachers could command in alternative employment in this state  that no rational, self-interested person with alternatives would teach in this state for the salary alone. The persons naturally selected to be teachers in these circumstances will be people who find satisfaction and compensation in service, achievement and other intangibles over and above money. In this context how will the public interest be served by precluding legislators from teaching? If our law contained such a preclusion, I would be the first to vote for its enforcement. Today's question is whether we will read into our law a proscription not within the plain meaning of its language.
Beyond this, it seems most probable that one serving in our legislature and also teaching at whatever level would offer invaluable educational opportunities and experiences to his or her students, particularly if the subjects taught be related to political science, government, civics or public affairs. Whatever the subject taught, students could not help but learn invaluable lessons from one serving in our legislative halls. In this day when more and more of our people shy away from public service of any sort, the legislator would likely serve as a positive and badly needed role model for his or her students.
Conversely, there is another reason why we should not have even considered straining Section 109 to bar legislator-school teachers. Notwithstanding the legislative achievement of the Educational Reform Act, implementation has been grudging. By all accounts our public educational institutions at all levels are in serious trouble. It would seem that the public interest would be well served by having within our legislature persons familiar with what goes on in our colleges and schools on a daily basis. That, to my mind, would seem so self-evident that we should not ban legislator-school teachers absent clear mandate in our law to that effect.
There is yet another circumstance, peculiar to today and I trust soon to pass, why we should read Section 109 as it has been written. Affirmance of the judgments below against Sen. Anderson, Reps. Frazier and Nunnally and Supervisor Killebrew, and the precedents those affirmances will establish, will affect most harshly our black officeholders. In recent years we have made significant progress in bringing black persons into the political process and specifically into public office. Many of these new officeholders are school teachers. Indeed, for many decades teaching was one of the few professions open to black persons, so that a substantial portion of our black citizens today possessing leadership abilities are school administrators or teachers. The judgments we affirm today will have the effect of precluding from most public offices many black persons possessing the penchant and aptitude for public service. If our law required such, I would so vote. I cite this as still another reason why we should not read Section 109 in a strained and artificial manner.
Our concern in the end is for a proper balance between the need for qualified men and women to enter public life and our equally important need to discourage self-dealing *717 on the part of public officials. The legislature of this state has exercised its judgment regarding the correct balance with the enactment of Section 25-4-105. That judgment is under any reading arguably constitutional. Absent strong countervailing circumstances suggesting that somehow the public weal is at risk  and there are no such circumstances shown in this record nor in any matters within our judicial knowledge, we should forge no new reading of Section 109 that disturbs the legislative judgment.

B. The View After the Majority's Reading of Section 109

The majority unmistakably holds that Section 109 prohibits any public school teacher's service in the legislature, suggesting that there is a rational purpose (never identified) behind such a reading. The only conceivable basis for such a view is that public school teacher-legislators are somehow in a position to pad their pockets at the expense of the public coffers, an evil which insofar as the present record reflects we have never experienced, nor could we so long as Mississippi's public school teachers remain the lowest paid in the nation and the school teacher-legislators are paid on the same basis as all others.
Be all that as it may. Consider how irrational is a constitutional scheme guarding the public interest against self-dealing legislators which has its principal impact upon one of the lowest paid and, from the vantage point of pecuniary self-interest, least attractive professions in our society. Lawyers serve in our legislature in substantial number and always have. The potential for compromise of the public interest, if one is disposed to the cynical view, is enormous. Lawyer-legislators are in a unique position to promote legislation designed to pad their pockets in a hundred ways and those of their clients as well. Yet no one suggests Section 109 prohibits lawyers serving in the legislature.
Run down the current membership of the Senate and House of Representatives and note the many different occupations and professions represented: farmers, contractors, building suppliers, a veterinarian, many private business people, manufacturers' representatives, insurance, real estate, health care, engineer, law enforcement, banking, automobile dealers, timber grower, accountant, optometrist, oil distributors, broadcasting, nutritionist, railroad, pharmacist, funeral director, printing and office supplies, advertising, entomologist and many more. Each of these vocations and the net worth of those who pursue them may be greatly affected by the action (or inaction) of the legislature. Moreover, legislators who pursue these various private vocations are  again to adopt the view of the cynic  in a far better position to conceal from public view the profits they may make of the public's expense, while the (literally) poor school teacher's salary is available for all to scrutinize.
I like to think the reason we do not fear these many private entrepreneurs and professionals serving in our legislative halls is that the overwhelming majority are honorable people who serve in the public interest informed by their collective experience. My cynic's eye tells me, however, that, hypothetically, the insurance agent could promote self-interested, protective legislation which could net him far, far more than Rep. James Nunnally's modest annual salary of $15,575.00. The lawyer legislator could, if he wished and were slick enough, promote legislation that could enhance the private interest of himself and his clients to in excess of ten times the meager salaries earned by Sen. Anderson and Rep. Frazier while teaching at Jackson State. And the list of (hypothetical) examples could be extended ad infinitum.
There is another context. Legislators are taxpayers. Does a legislator have a conflict of interest when he votes on a tax bill? Should a legislator who is a consumer be allowed to vote on credit card legislation? On utility rate regulation legislation? Does not a legislator who owns property have a direct personal interest in ad valorem taxation legislation? Should a legislator who is alive be allowed to vote on matters affecting the public health and safety? The examples could be multiplied tenfold, reductio ad absurdum.
*718 The point, of course, is that we this day afford Section 109 a construction which in practical effect is irrational, if not silly. If as the Court holds its purpose is to protect the public interest from the human frailty of self-dealing, its arrow wounds at most the big toe of its intended victim. Even if it be thought we have reason to be wary of that toe, we proceed upon a record that fails to reflect a single stubbing, gouty inflammation, or other offending experience. We convict ourselves in the court of common sense.

VI. The Disposition I Would Prefer

A. Affirm As To Knox; Reverse and Render As To Anderson, Frazier, Nunnally, Killebrew and Logan

These things said, I would reverse and render the judgments entered against Sen. Anderson, Rep. Frazier, Killebrew and Alderman Logan. I would reverse and render the judgment against Rep. Nunnally both with respect to the Section 109 violation charged because he is a public school teacher and that emanating from his wife's teaching contract.[8] I concur in the affirmance of the judgment against Supervisor Knox.[9] I agree that the judgment against Sen. Purvis has become final by reason of his failure to perfect an appeal and, accordingly, no adjudication is here required.

B. A Lawyer By Any Other Name Is Still A Lawyer

I concur in affirmance on the Ethics Commission's cross-appeal, with one exception. That I have disagreed with the Commission on the merits does not mean I doubt the sincerity of their present efforts to perform their important public responsibilities. The Ethics Commission had lawful authority to bring its suit. When the Attorney General refused to proceed as the Commission thought best, the Commission had the authority even the duty to obtain private counsel and proceed. The reasonable *719 and necessary attorneys fees and legal expenses incurred by the Commission should be paid, not by the Commission members nor out of its budget, but by the Attorney General from his budget.
I concur in the result in the portion of the majority opinion labeled Legality of the Ethics Commission's Suit and in much of its reasoning en route. My view of the point may be simply put. The Attorney General is a lawyer, albeit a very special kind of lawyer. His specialty in the present context is by reference to his ultimate client, the people of this state and the agencies that serve them. When the Attorney General and a state agency, such as the Ethics Commission, reach an impasse regarding litigation strategy, resolution should proceed much as in private law practice. The lawyer gives advice. The client decides whether to accept that advice. The lawyer then advocates the client's interests as the client defines them. In this case, the client, the Ethics Commission, has the prerogative of controlling the actions of its lawyer, the Attorney General, the same as any other client has ultimate authority to tell his lawyer what to do, who to sue, what litigational strategies to pursue.
If the Attorney General disagrees, he has two courses. He may afford the Commission counsel who does the Commission's bidding or, he may decline to proceed, allowing the Commission to obtain private counsel at the Attorney General's expense. In either case the Attorney General, as lawyer for the people answerable at the polls, may appear on behalf of the people qua State of Mississippi and proceed as he sees his duty. But he may not deprive the agency, the Ethics Commission, of the effective and free assistance of counsel.
ANDERSON, J., joins this opinion.
SULLIVAN, Justice, concurring in part and dissenting in part:
Section 109 of the Mississippi Constitution is an absolute prohibition against any public officer or member of the legislature having an interest in any contract with the state or any district, county, city, or town thereof authorized by any law passed or order made by any board on which he may be or may have been a member during the term for which he shall have been chosen or within one year after the expiration of the term.[1]
As the majority has recognized, this provision is "more specific than many, perhaps most" of the provisions found within our Constitution. Majority's Opinion, at 694. Further, in reviewing and interpreting this provision, we are required to "interpret the section in accordance with the plain meaning of its words so long as it bears some rational relationship to this purpose." Id. at 695. I fully agree with the majority's recognition of these general principles as guidelines for interpreting Section 109. However, I find some difficulty in the majority's application of these guiding principles to the individual defendants in this case. With this in mind, I begin by setting forth those portions of the majority's opinion with which I am in agreement.

I.

CONCURRING OPINION

A.

THE ETHICS COMMISSION SUIT
The majority begins its opinion by addressing the legality of the Ethics Commission suit. This portion of the opinion delicately balances the power and authority of the attorney general, normally entrusted with bringing suits of this nature before the courts on behalf of the state, with the statutory power and ability of state agencies to also seek adjudication of issues deemed to be of statewide importance but which the attorney general has declined to pursue. The conclusion is that the judiciary, rather than the attorney general, should ultimately decide whether the agency should be allowed to proceed without the attorney general. This holding serves to protect the interest of the state, the interest of our state agencies, and most of *720 all, the interest of the people of Mississippi. I concur fully in both the reasoning and the result reached by the majority in this portion of the opinion.

B.

INTERPRETATION AND APPLICATION OF SECTION 109 TO DEFENDANTS ANDERSON, FRAZIER AND NUNNALLY
Thereafter, the majority proceeds to the core issue to be resolved today, the interpretation and application of Section 109 to the defendants. Before any public officer or member of the Legislature can be held to have violated Section 109, he must meet all four of the following factors:
(a) having any direct or indirect interest in any contract
(b) with the state or any political subdivision
(c) executed during his term of office or one year thereafter, and
(d) authorized by any law, or order of any board of which he was a member.
Majority opinion, at 693.
Applying these factors to defendants Anderson, Frazier, and Nunnally, the inescapable conclusion is that each violated Section 109. Each had a direct interest in a contract with the state that was executed during their terms of office and which was authorized by the Legislature of which they were members. The majority's holding as to these defendants is flawless and I concur fully.

C.

DEFENDANTS KILLEBREW, LOGAN & KNOX
Turning its attention next to defendants Killebrew and Logan, the majority holds that each violated Section 109 by serving as a member of a board and casting a "discretionary" vote on local tax levies which were used to fund their local contracts with the school districts. Majority opinion, at 700. Further, the majority holds that defendant Knox also violated Section 109 when, while serving as a county board member, he too cast a "discretionary" vote authorizing two banks, in which he had a financial interest, to serve as county depositories. Id. at 704. Insofar as the majority holds that each of these defendants violated Section 109, I concur fully. However, I fail to see any distinction between "discretionary" and "mandatory" voting and will discuss my dissent to this portion of the majority's opinion infra.

D.

THE ETHICS COMMISSION CROSS-APPEAL
Finally, the majority holds that the chancellor was not manifestly wrong in declining to require the defendants to pay restitution for the compensation received in violation of Section 109. The records before us clearly show that the defendants at all times acted in good faith reliance on the statutes which have been condemned by the majority's decision as unconstitutional. The majority correctly applies the rule set forth in Golden v. Thompson, 194 Miss. 241, 11 So.2d 906 (1943), and affirms the chancellor's decision. The majority's holding here is sound and I again concur fully with this portion of the opinion.

II.

DISSENTING OPINION
From what I have previously said, it is apparent that I am in agreement with most of the majority's opinion. However, I feel that certain portions of the majority's opinion stand in direct conflict with the clear and unequivocal language contained in Section 109. Because my reading and application of Section 109 is so different from that of the majority, I feel compelled to voice my disagreement at this point.

A.

MRS. NUNNALLY
The majority concludes that Representative Nunnally did not have an indirect interest in the appropriation bill which provided the "majority" of income paid to Mrs. Nunnally and thus was not in violation of Section *721 109. While the majority's pronouncement as to Mrs. Nunnally is emotionally attractive, it is neither logically nor constitutionally sound.
At first blush, the words "directly or indirectly" appear to be little more than surplusage of Section 109. But when these words are considered, they too are to be construed in their plain meanings and when this is done, no "gray areas" appear. The legislature obviously recognized what "indirect" meant and attempted to circumvent the language of Section 109 by statute. See Miss. Code Ann., § 25-4-105(3)(h) (Supp. 1985). Today, the majority strikes down this statute as it applies to the legislators themselves but leaves it intact with regard to the legislators' relatives or spouses.
Once the language in Section 109 is given its plain meaning, nothing can be plainer to me than that the defendant Nunnally had a direct interest in a contract with the State when he served as a member of the legislature which passed the appropriation bill to pay his salary as a school teacher, and that he had an indirect interest in the appropriation bill which funded the contract for his wife as a school teacher. To hold otherwise is to say that Article IV, Section 109, does not prohibit public officers and members of the legislature from being indirectly interested in a contract authorized by any law passed or order made by any board of which the officer may have been a member. Such a holding is in direct conflict with the clear and unambiguous language contained in Section 109.
Nevertheless, the majority would have us at this point balance the language of 109 against the potential harm to the State by its enforcement. While it is true that Mrs. Nunnally is only one of several thousand people affected by the appropriation bill and the law setting teachers' salaries, the same is equally true as to Representative Nunnally. Yet, when Representative Nunnally presented this argument to the majority, it fell upon deaf ears because "... 109 makes no exception for members of a large class." Majority opinion, at 697. The same holds true for the class of which Mrs. Nunnally is a member. In my opinion there is absolutely no distinction that can be drawn between these classes. Further, the very purpose of Section 109 was to prevent exactly the type of conduct engaged in by defendant Nunnally. Prevention of this type of conduct, contrary to what the majority would have us believe, causes no grave risk to be imposed on the sound government of this state.
It is our duty to make final interpretations of the language of our Constitution. Section 109 means what it says and needs no interpretation. We are not called upon to reach some balance on the question of the indirect interest of a public officer in the contract of his wife. The framers of the constitution have expressly reached that balance for us.
Two questions faced the constitutional convention delegates; (1) they could open the doors to public office to all citizens and run the risk that public service would be abused into self service; or (2) they could insure that public service would not become self service by limiting public office to only those people who would have no personal interest in any contract authorized by the body to which they belonged.
It was a hard choice, but it was firmly made. Section 109 prohibits even the appearance of self service and it does so in no uncertain terms. It would be folly to assume that the authors of Section 109 were not acutely aware that this choice would prevent many excellent people from holding public office. However, they concluded that the danger of the possible abuse of public trust and money was more to be feared than the necessary loss of potentially outstanding public servants. That is the balancing of Section 109. None other is necessary. "Thou shalt not" means the same in 1987 that it meant in 1890; it means "THOU SHALT NOT."
Article III, Sections 5 and 6 vest all governmental power in the people of our state. If the people felt this additional balancing was needed because they were being damaged by the loss of these potential servants, they could have simply amended Section 109 to delete indirect interest. In the *722 97 years since its adoption, the people have not chosen to take that course and have on two recent occasions expressly refused any further "balancing."[2] In light of this, it should be clear to all that the people of our state seem to understand and prefer the absolute prohibition created in Section 109.
The legislature may not amend the constitution without the authorization of the people. Further, this court is also without power to amend the constitution. However, the majority's interpretation of the Nunnally situation has in effect amended Section 109 to excise from it half of its force. By amending Section 109 at its vital center, the majority rejects both the wisdom of the authors of the last century and the wisdom of the people of this century, in whom the governmental power is vested. The majority has done, in the name of the best interest of the people, that which the people themselves have refused to do. For this reason, I cannot concur in the finding that no violation of Section 109 occurs when the spouse of a public official has a direct interest in a contract authorized by the public body to which that official belongs. The direct interest of the spouse constitutes an indirect interest of the public official.

B.

DISCRETIONARY VERSUS MANDATORY ACTS
With regard to defendants Logan and Knox, the majority attempts to make a distinction between a discretionary act and a mandatory act and further holds that mandatory acts do not violate Section 109. Again, I must dissent because I believe that such a distinction cannot be made as Section 109 does not contain or implicitly allow such a distinction.
In its discussion of the phantom difference that is supposed to exist between the "discretionary" act and the "mandatory" act, one cannot help but glean from the majority's view that a public officer may violate the constitution when he has no choice in the matter. The language of the majority implies that this has something to do with voting. However, a violation of Section 109 is not contingent upon whether Logan's vote to levy a tax which would be used in part to pay his salary was either discretionary or mandatory. Voting has nothing to do with Section 109. The violation occurred because Logan was a member of a board which authorized a contract with the State or any political subdivision which he had a direct or indirect interest in and which was executed during his term of office. Merely being a member of the public body when the contract was authorized is enough to invoke the prohibition of Section 109. To say that Mr. Logan and others of his class cannot be penalized for voting affirmatively on a matter in which a court decree or statute gave him no choice is to ignore the fact that Article IV, Section 109, of the Constitution, which is superior to both the chancery court decree and the statute, also gave him no choice. That which the constitution specifically forbids cannot be allowed because a court or legislative act mandates it. If this were so then this case would be moot, for the legislature has already authorized the violations of Section 109 by statute. See Miss.Code. Ann., § 25-4-105(3)(a) (Supp. 1985).
Further, this would apply equally to the majority's attempt again to make a distinction between discretionary and mandatory authority with regard to defendant Knox. Thus, I would hold that each of these defendants violated Section 109 regardless of whether the votes they cast or the authority they had was characterized as "discretionary" or "mandatory." Any attempt to make a distinction between discretionary and a mandatory act or authority is fruitless. Had the framers of the Constitution of 1890 wished to make that distinction, they had the opportunity to do so and did not. The people have chosen not to make such a distinction. It is unwise for this Court to make that distinction now.

C.

THE RELIEF
Finally, as to the relief granted by the majority, I fear that I must again dissent. *723 I am not persuaded by the reasoning of the majority that it is in the best interest of the government or the people of this State that this declaratory judgment shall be of no force and effect until January 1, 1988. I have a conceptual difficulty with the Supreme Court of this State declaring certain conduct to clearly violate the Constitution of this State but allow such conduct to continue until some future date as a matter of public convenience. If the conduct is indeed unconstitutional, it is unconstitutional right now and in the future.
As members of the judiciary we have sworn an oath to discharge and perform all the duties incumbent upon us according to the best of our ability and understanding agreeable to the Constitution of the United States and the Constitution and Laws of the State of Mississippi.[3] Those defendants who are members of the legislature have also sworn that they will faithfully support the Constitution of the State of Mississippi and furthermore, that they will as soon as practical after taking their oath carefully read or have read to them the Constitution of the State of Mississippi and will endeavor to note and to execute all of the requirements imposed by that Constitution on the legislature.[4] All other public officials in Mississippi also solemnly swear that they will support the constitution of the State of Mississippi and obey the law.[5] Therefore the presumption arises that all of the parties of this litigation were aware of the contents of Article IV, Section 109. It is equally obvious that they could have and should have known that they were engaged in conduct that violated the plain language of Article IV, Section 109.
Therefore, I view it as the duty of this Court to declare that these statutes are unconstitutional and to declare that the acts complained of were unconstitutional at the time they were done, and are unconstitutional right now. I am not persuaded that it is in the best interest of the State of Mississippi, the people of Mississippi or these litigants for us to hold that it is simply inconvenient for us to say that the unconstitutional activity must cease at once, but may continue until such time as the Constitution of the State of Mississippi might more conveniently be enforced.
Therefore, I again voice my dissent to this portion of the majority's opinion.

III.

SUMMATION
In summary, I would concur in the portions of the majority's opinion which held that the Ethics Commission could properly institute and oversee the litigation of these matters. This portion of the opinion serves to insure that issues of statewide importance are properly adjudicated in the event of a disagreement between two branches of our government.
Further, I would agree that § 25-4-105(3)(h) of the Mississippi Code was unconstitutional insofar as it authorizes legislators to be employed by state financed agencies other than the legislative body of which they are members. I would also hold that this provision is unconstitutional with regard to legislators or board members relatives and spouses as well. Thus, I would affirm the declaratory judgment as to Frazier and Anderson and I would affirm the declaratory judgment as to Mr. Nunnally in both particulars. As to Mr. Logan and Mr. Killebrew, I would affirm the declaratory judgment as to each of them but would not read into Article IV, Section 109, a distinction between mandatory and discretionary voting. No such distinction appears in the language of Section 109 and it is not our place to judicially create such a distinction.
As to Mr. Knox, I would find that the provisions of the Mississippi Code Annotated, § 25-4-103(3)(a), which authorized the contract between the banks in which Knox was an officer and a shareholder and the county when he was a member of the board of supervisors of that county is unconstitutional and void. I would therefore affirm *724 the judgment as to Mr. Knox except for the portion which attempts to distinguish between "discretionary" and "mandatory" authority.
Finally, I would disagree with the majority's opinion that this declaratory judgment shall be of no force and effect until January 1, 1988. As I previously stated, the conduct in this case is unconstitutional now and in the future. I see no reason why this Court today should create a grace period during which clearly unconstitutional conduct will be allowed to continue. As such, I dissent from this portion of the majority's opinion.
Therefore, I concur in part and dissent in part.
ANDERSON, Justice, concurring in part and dissenting in part:
Because I cannot agree with the majority as to where to draw the line between the "logic of words" and the "logic of realities," found in the majority opinion at page 698, I must respectfully dissent.
With deference, I cannot understand how the majority can recognize that under modern economic conditions, spousal income is vital to the vast majority of families and yet declare the legislators' spouses' interest in that income is not sufficient to come within prohibition of Section 109, while at the same time ruling that a legislator is prohibited from working, even part time, as a teacher in our public schools or institutions of higher learning.
This anomaly cannot be justified, as the majority attempts to do, by supposing the people could not understand how a full-time state employee could serve in the legislature. Firstly, our legislators are not full-time, but part-time. Secondly, at least one of the teaching positions we have declared violative of Section 109, (Frazier's) was also part-time. Moreover, anyone thought to be improperly "double-dipping" would have to answer to the electorate, which presumably would correct any inequity.
I agree wholeheartedly with the majority in recognizing that it is difficult to get qualified citizens to offer their talents for public office. It is vital to our form of government to assure that our legislature includes a diversity of persons and ideas. I simply think this reasoning applies equally to the legislators and their spouses. I do not believe the authors of Section 109 envisioned the day when government spending would be so pervasive in our economy, that giving literal meaning to the words of that section would have a devastating effect when applied to our legislature.
It "simply defies practical wisdom to carry this section" to the extreme to prohibit one from serving in the legislature and being employed to cut the schoolhouse grass during the summer, while at the same time permitting that person's wife to serve as superintendent of a school district. I believe any potential conflict of interests for a legislator/public employee, can and should be controlled by statutory and legislative rules directed to specific votes and participation on specific issues rather than the broad construction of Section 109 as interpreted by the majority.
PRATHER, Justice, specially concurring:
I concur with the ultimate holding of the majority opinion; however, I respectfully disagree with the majority view's reliance on the negative votes of the 1984 and 1986 referendums as one basis for that result.
The opinion addresses the role of two unsuccessful attempts by the legislature, in 1984 and 1986, to amend Article 4, Section 109 of the Mississippi Constitution. In the section entitled "Interpretation Guidelines" the majority opinions states:
Finally, in our interpretation we must take into account the rejection by the people in 1984, and again in 1986 of proposed amendments to § 109. Article 3, Sections 5 and 6 of our Constitution leave no doubt that "all political power is vested in, and derived from, the people," and the people have the "sole and exclusive right to ... alter ... their constitution."
Later, in the section entitled "Anderson, Frazier and Nunnally," the majority opinion states, "We cannot hold [the electorate's] *725 rejection meaningless to any interpretation of § 109."
When construing our existing constitution or our existing statutory law, I believe it is improper for this Court to rely on the negative votes cast in a referendum. This belief is buttressed by my view that it is impossible to assign a single, unified motivation to those casting the negative votes.
It is my conclusion that the judicial function of this Court is to construe the constitution and statutes of this state based on the plain meaning of their language and apply these words to the facts of the cases presented. Farrar v. State, 191 Miss. 1, 2 So.2d 146 (1941); McCulloch v. Stone, 64 Miss. 378, 8 So. 236 (1886).
In addition to the reliance on the electorate's rejection of the proposed amendments, the majority opinion employs an analysis of the plain meaning of the language of section 109. I reach the same result as the majority by using the "plain meaning" analysis, exclusive of reliance on the failed referendums. For that reason, I concur.
NOTES
[1] Miss. Code Ann. § 37-57-105 was amended under the Uniform Law of 1986 so as to remove this discretionary authority in the municipal boards.
[2] As part of the exhibits to the stipulations between the plaintiffs and Logan (R. 347-49), the salary for Logan sets forth the following:

An Elementary School Principal shall be paid a salary of 1.12 times the monthly teachers salary for 10 months.
AAA-23 Donald Logan $22,878 $18,600.00 State 1,922.00 Local $20,522.00 Base 2,280.00 10th month $22,802.00 2,463.00 Factor 1.12 $25,265.00 Total Salary 300.00[*]
[*] Salary supplement passed by order of school district (this figure in handwriting)
[3] Neither the pleadings nor the proof specifically pointed out the appropriations bills Nunnally voted on; however, we take judicial notice of these acts. In the Attorney General's action against Frazier, the State saw to it that the specific bills which constituted the violation were in the record. The Ethics Commission has failed to favor us with this information.
[4] Again we express dissatisfaction with the record. Neither the pertinent employment contracts nor the terms of those contracts were made a part of the pleadings, save for certain facts stipulated by Nunnally.
[5] The Ethics Commission failed to charge anywhere that Nunnally violated § 109 by virtue of this bill being passed while Nunnally was in the Legislature. It was only upon questioning by the Court in oral argument that this was brought out. We take judicial notice of Senate Bill No. 2876.
[6] Neither the pleadings nor the proof contained the pertinent employment contracts between Killebrew and the Quitman County School District.
[7] Miss. Code Ann. § 37-57-105 was amended under the Uniform Law of 1986 so as to remove discretionary authority in the Board of Supervisors whether or not to levy the tax requested by the county school board.
[8] Neither the pleadings nor the proof specifically pointed out the appropriations bills Anderson voted on; however, we take judicial notice of these acts. In the Attorney General's action against Frazier, the State saw to it that the specific bills which constituted the violation were in the record. The Ethics Commission has failed to favor us with this information.
[9] Again we must express our dissatisfaction with the record of the Ethics Commission. See Footnote 8.
[10] We take judicial notice of this act, which was not made a part of the record.
[11] Section 10 of Chapter 469 repealed Miss. Code Ann. § 97-11-19, a criminal statute implementing Section 109, beginning with § 1229, Code of 1892. By Chapter 238, Laws of 1924, the criminal statute was made inapplicable to member of boards of supervisors and governing boards of municipalities who were stockholders or officers of banks bidding for public funds as county depositories, provided the bank involved either submitted the lowest bid and best bid, or was the only bank in the county. This exemption remained a part of this statute until its repeal in 1983.
[12] The individual members of the Ethics Commission were Walter Brown, chairman; Ben H. Stone, vice-chairman,; Mark G. Hazard, secretary; Eugene L. Fair, Nina B. Goolsby, John C. Henegan, and Elizabeth C. Powers.
[13] The chancellor sustained the motion of Knox to dismiss the action as to him because he was already being sued in the action filed by the Attorney General.
[14] After careful examination of the statutes, we think that what the learned chancellor probably meant to say was that the statutory exceptions permitted certain contracts whether or not the contracts were authorized by the public body of which the officer was a member. We note that the exception pertaining to employment contracts, Miss. Code Ann. § 25-4-105(3)(h) (Supp. 1985), does not readily fit within this framework.
[15] For example, it would have been perfectly proper for the chancellor to dismiss the Commission's case against Anderson, since the Frazier suit brought by the State had covered the issue of a legislator-university professor in violation of § 109.

While we can view the cases of Frazier and Anderson in hindsight and determine it was unnecessary for the Commission to file that suit, there was no way for the chancellor to have determined whether or not there was some difference between the two situations when he made his ruling on the motion to dismiss.
[16] Of course, all state agencies are still duty bound to follow any statutory regulations concerning that agency's ability to bring a lawsuit. We reiterate that our holding today does not usurp the Attorney General of his common law powers. However, in matters of vital statewide concern, where the Attorney General and the state agency cannot agree on the proper procedure of filing suit, the state agency should have its day in court if the agency is fulfilling its statutory duty.
[17] As we stated in State v. Mississippi Public Service Comm'n, 418 So.2d 779, 784 (Miss. 1982), where the Attorney General was allowed to intervene in the case even though an Assistant Attorney General was assigned to represent the commission:

The attorney general has a large staff which can be assigned in such manner as to afford independent legal counsel and representation to the various agencies. The unique position of the attorney general requires that when his views differ from or he finds himself at odds with an agency, then he must allow the assigned counsel or specially appointed counsel to represent the agency unfettered and uninfluenced by the attorney general's personal opinion. If the public interest is involved, he may intervene to protect it. [Emphasis added]
[18] In Jesco, we held the school district was statutorily authorized to file suit pursuant to Miss. Code Ann. § 11-45-11 (1972), which gives the State the same rights as individuals in bringing an action. Since that lawsuit dealt with one isolated contract of local importance, our holding today, which pertains to issues of serious state-wide concern, is distinguishable and therefore is no departure from Jesco.
[19] To further illustrate our views that an appropriation bill authorizes a contract are by no means singular, the Texas Attorney General has opined that a legislator cannot be interested in any contract with the state paid for by appropriation act funds, since to do so would violate Article III, Section 18 of the Texas Constitution, which provides in pertinent part: "... nor shall any member of the Legislature be interested, either directly or indirectly, in any contract with the State, or any county thereof, authorized by any law passed during the term for which he was elected."

The letter proclaims stentorially:
Over a sixty year period, five different attorneys general of the state have considered whether an appropriation act, as well as general legislation, will operate as "authorizing" legislation within the prohibition of Article III, Section 18 of the Texas Constitution. Every one of them have reached the same conclusion: it will.
Op.Att'y Gen.  Tx., JM-162, (June 8, 1984).
The same letter cites Department of Agriculture v. Printing Ind. Ass'n., 600 S.W.2d 264, 270 (Tex. 1980), which states:
A constitutional provision designed to guard against favoritism, corruption and extravagance in state government should not be given a narrow construction unless the intent of the framers to do so is clear, particularly where it has received a broad construction for many years.
The Tennessee Attorney General has rendered a similar opinion that it would be in violation of that state's conflict of interest statute for a person on a faculty of a state university to serve in the legislature because of the fact the university was operated by funds appropriated by law. Op.Att'y Gen.  Tenn., 85-253 (Sept. 30, 1985).
[20] While it would make no difference in our construction of § 109, Frazier and Anderson suggest that since the board of trustees of the state institutions of higher learning, a constitutional body under Article 8, § 213-A, is in control of our state universities, it is carrying § 109 too far to prohibit their being on the faculty of a state supported university.

This argument ignores the obvious. Our colleges and universities are virtual total dependents of the Legislative branch of Government. One example of the importance of the Legislature to such institutions may be observed on the "Government Appreciation Day" of three of our major universities, a euphemism for "Legislators Appreciation Day," although other state officials are generously invited. The entertainment and food are always impressive, at times lavish.
A legislator-faculty member at a state supported college might well provoke the inquiry: Who's the boss?
In 1944 the people adopted Article 8, § 213-A to the Constitution, the very purpose of which was to remove our colleges and universities from state politics. We do not propose to interpret § 109 so as to put them back in politics, and in a far more formidable and threatening way than the evils corrected by Article 8, § 213-A.
[21] Based on figures from the 1980 census of our state, there were 404,603 married couples in the labor force. Of that number 297,292 households, or 73%, reported both spouses were in the labor force. 1980 Census of Population, Vol. 1, Chapter D, Part 26 (Miss.), Table 215, at p. 26-131.
[22] Again illustrative of this view are opinions of the Attorney General of Tennessee which aptly state that "the appropriating body is the superintending agency," recognizing, of course, that he who holds the purse is the one who controls. See: Op.Att'y Gen.  Tenn., 85-253 (Sept. 30, 1985); Id., 85-122 (Apr. 16, 1985); 84-177 (May 25, 1984); 83-57 (Feb. 1, 1983); 79-5 (Jan. 8, 1979). See also Harrison v. City of Elizabeth, 57 A. 132, 132 (N.J. 1904) (city councilman who made appropriation to board of fire commissioners was interested in plumbing contract awarded by that board, when his compensation was derived from said appropriation).
[23] Miss. Code Ann. § 37-57-105 (Supp. 1985) provides, in pertinent part, "the municipal governing authorities, upon receipt of ... an order adopted by the [school district board of trustees] requesting a tax levy for the support of the school district, shall ... levy an annual ad valorem tax in the amount fixed in such order ..." [Emphasis added] The statute further provides that this "mandatory levy" shall not exceed certain millage limitations.
[24] In this connection, it is also noteworthy that the Attorney General of Tennessee has issued an advisory opinion finding a violation of that state's conflict of interest statute when a state legislator teaches at a state university, since the faculty member's salary is funded by a general appropriation bill passed by the legislature. Op. Atty.Gen.  Tenn., 85-253, (Sept. 30, 1985). See supra footnotes 19 and 22.
[25] In regard to the amendment to Miss. Code Ann. § 37-57-105 (Supp. 1985), which now provides for mandatory local tax levies in support of the school districts by county boards of supervisors and city boards alike, we are not called upon to decide whether this amendment would remove Killebrew from having a conflict of interest as to any tax levies imposed by Quitman County for the years beginning with 1986.
[26] The appellate court recognized this exception where the action of the county board was ministerial and not discretionary:

It may well be that, in some counties the county board, as part of a long tradition, always confers depository status upon any bank suggested by the treasurer. It may also be that, in the same counties, county board members never propose the designation of a bank not suggested by the treasurer. A county board member who, as part of such a well-established tradition, votes in this perfunctory way to confer depository status upon a banking corporation, of which he is a shareholder or a director, does not in our view work an offense of the Act.
* * * * * *
It would appear that where a county board member votes on the question on conferring depository status upon a bank, but does not have the opportunity, in any realistic sense, of influencing the formation of a contract between the treasurer and the bank, the Act is not violated.
27 Ill.Dec. at 570-571, 389 N.E.2d at 634-635. Cf. People v. Meschutt, 3 A.D.2d 938, 163 N.Y.S.2d 891 (1957) (county board member designating bank as county depository did not violate conflict-of-interest statute since county treasurer was officer making contract).
[1] The majority, for example, undergirds its reading of Section 109 with question begging truisms: "Such an interpretation would insult the common sense of our predecessors..." (p. 695). I find nothing in the opinion authoritatively identifying the common sense of our predecessors, nor do I know of any reliable way of obtaining such information.
[2] Alexander was such a case as the legislature via statutory enactment had arrogated to itself the performance of "functions at the core of the executive ... power," 441 So.2d at 1345, in clear contravention of the separation of powers mandate found in Art. 1, §§ 1 and 2 of our Constitution.
[3] The majority's acknowledgment that "interest" and "authorized" are among Section 109's "gray areas" (p. 693) and that "most of these cases ... approach the edge of the target" (p. 695) is in effect a concession sub silentio that, under Miller and the principles cited in this part, reversal is required.
[4] Of interest is the following excerpt from Advisory Opinion No. 530 (1981) of the Alabama Ethics Commission.

The present legislators come from many and varied occupational and professional groups. They campaign openly in their districts with the overwhelming majority of the voters fully aware of the manner in which they earn a living. Voters who elect an educator, whether a teacher or administrative employee, must be aware that their newly-elected representative or senator will confront an education budget. If the voters did not wish that candidate to vote on the education budget because of his professional background, then the proper course of action would be to elect his opponent.
See Opinion of the Justices No. 317, 474 So.2d 700, 704 (Ala. 1984); but see Note, Conflicts of Interest of State and Local Legislators, 55 Iowa L.Rev. 450, 454-44 (1969); Note, Conflicts of Interest of State Legislators, 76 Harv.L.Rev. 1209, 1213-14 (1963).
[5] I do not mean to suggest that the point is not arguable. Alabama, for example, construes "interest" so that there is no unconstitutional conflict of interest

so long as the bill does not affect the legislator [school teacher] in a way different from the way it affects the other members of the class to which he belongs.
Opinion of the Justices No. 317, 474 So.2d 700, 704 (Ala. 1984). Under this view of "interest," all of the school teacher appellants before us today would be exonerated.
[6] The highest courts of two of our sister states  Alabama and Tennessee  have found no impermissible conflicts where school teachers are also public servants who serve in legislative bodies at the state and local levels. See Opinion of the Justices No. 317, 474 So.2d 700 (Ala. 1984); State Ex Rel. Finger v. Kidd, 534 S.W.2d 309 (Tenn. 1976). Admittedly, the laws there construed include language different from that found in Section 109, though not that different.
[7] Though I have often warned of the tyranny of labels, there is a grand division of three at-their-core-quite-distinct types of statements or ideas lawyers and judges work with daily: facts, law and value judgments. The boundaries separating these are fuzzy and gray. Still, they may be instructively reflected on a triangle.

I have always thought it important in legal writing to keep well in mind the type of statement one is making, for each has its proper, limited and distinct place. The parties and the majority at many points, subtly and perhaps unintentionally, collapse these distinctions, particularly that between Law and Value Judgments, and in different ways besides. I have tried to avoid this cardinal sin, though obviously my success is for others to judge.
[8] I certainly agree with the majority's holding that Rep. Nunnally has not offended Section 109 because he serves in the legislature and his wife is a public school teacher. I am even sympathetic with much of the majority's discussion on this issue (pp. 697-698), though that discussion is in the main so many subjective value judgments and not much law.

It seems clear to my mind that the majority's reasoning en route to its holding is legally incorrect. Section 109 says that Rep. Nunnally may not be "interested, directly or indirectly," in a contract authorized by the legislature. Certainly, Mrs. Nunnally's contract to teach school in Tippah County is a "contract" within Section 109. Certainly the money Mrs. Nunnally earns assists the Nunnally family in making ends meet. How then can it be said that Rep. Nunnally does not have an indirect interest in his wife's contract? If this is not an indirect interest, I can't imagine what one is. Compare Cassibry v. State, 404 So.2d 1360 (Miss. 1981). I would reverse and render on this point because Nunnally is not a trustee of the South Tippah County Consolidated School District, the body which authorized Mrs. Nunnally's contract, not on the dubious premise that Nunnally is without an indirect interest in his wife's contract.
[9] The case of Panola County Supervisor Bill F. Knox is the only one the majority comes close to analyzing correctly. "Interest" under Section 109 is read broadly as it should be. Knox's relationship with the State Bank of Como is more than sufficient to render him "interested ... indirectly" in the bank's "contracts." The Panola County Board of Supervisors' arrangement with the bank wherein county funds are there deposited is a "contract." The contract was authorized directly by vote of the Board of Supervisors of which Knox was one of five members. The Board did not merely set aside funds for another legally independent public agency to then use in regard to its own contracts. The Board of Supervisors itself was the sole repository of the legal power to place county funds with banks and the Board in fact placed county funds with Knox' bank. To the extent that Section 25-4-105(3)(a) purports to sanction Knox' situation, it is clearly unconstitutional.

Here as elsewhere the distinction between law and value judgments must be made. The facts regarding Knox' case make clear that no de facto compromise of the public interest has occurred as a result of the Panola County Board of Supervisors' treating Knox' bank the same as all other banks in the county. There is nothing in the record suggesting that the Board would have entered any different arrangement with State Bank of Como if Knox had had no relationship with that bank or had not been Panola County District 2 Supervisor. Still, to reverse as to Knox we would have to ignore the language of Section 109 which, even when read favorably to Knox as it should be, see Part II(B) above, says that Knox, so long as he is a member of the Board of Supervisors, may not be interested, directly or indirectly, in any contract authorized by the Panola County Board of Supervisors. That he has such an indirect interest produces illegality, notwithstanding the value judgment of many that he has nothing wrong.
[1] Miss. Const. of 1890, Article IV, § 109.
[2] See Majority opinion, at 684-685, (discussing proposed amendments to Section 109).
[3] Miss. Const. of 1890, Article VI, § 155.
[4] Miss. Const. of 1890, Article IV, § 40.
[5] Miss. Const. of 1890, Article XIV, § 268.